**CONSUMER LITIGATION LAW CENTER, APC**
September J. Katje, Esq. (SBN 227896)
100 North Barranca, Suite 700
West Covina, California 91791
Telephone:     (800) 787-5616
Fax:               (888) 909-7947
Email:          sk@consumerlitigationlawcenter.com

Attorney for Plaintiff, SHARON BROTHERS, an individual

# UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA –

## SAN JOSE DIVISION

| | |
|---|---|
| SHARON BROTHERS, an individual, <br><br> Plaintiff, <br><br> v. <br><br> BANK OF AMERICA, N.A., COUNTRYWIDE HOME LOANS, INC.; RECONTRUST COMPANY, N.A.; BNY MELLON FKA THE BANK OF NEW YORK; and all persons or entities unknown claiming any legal or equitable right, title, estate, lien or interest in the property described in this complaint adverse to Plaintiff's title thereto, and DOES 1 through 25, inclusive, <br><br> Defendants. | Case No.: 5:12-cv-03121-EJD <br><br> **First Amended Complaint  For:** <br><br> 1.  **Fraud In Origination Of Loan** <br> 2.  **Set Aside Pending Trustee Sale Based Upon Wrongful Foreclosure In Violation Of Civil Code §2923.5** <br> 3.  **Set Aside Pending Trustee Sale Based Upon Wrongful Foreclosure In Violation Of Civil Code §2924** <br> 4.  **Violation Of Civil Code §2923.6** <br> 5.  **Violation Of RESPA** <br> 6.  **Breach of Contract** <br> 7.  **Breach Of Covenant Of Good Faith And Fair Dealing** <br> 8.  **Violation Of TILA, 15 U.S.C. §1601** <br> 9.  **Rescission** <br> 10. **Predatory Lending; Violation Of B&P §17200** <br> 11. **Unfair And Deceptive Business Act Practices (UDAP)** <br> 12. **Intentional Misrepresentation** <br> 13. **Negligent Misrepresentation** <br> 14. **Quiet Title** <br><br> **And Demand For Jury Trial** <br> **Unlimited Jurisdiction** |

COMES NOW the Plaintiff, SHARON BROTHERS ("Plaintiff"), complaining of the

**FIRST AMENDED COMPLAINT FOR ORIGINATION FRAUD AND WRONGFUL FORECLOSURE UNDER CC § 2923.5**

Defendants, and each of them, the following:

## I.

## <u>INTRODUCTION</u>

1.      This is an action for origination fraud, predatory lending, violations of California *Bus. & Prof. Code* §§ 17200, et seq., and other Federal and California statutory and common law.   Plaintiff brings this action against Defendants, BANK OF AMERICA, N.A.; COUNTYRWIDE HOME LOAN, INC.; RECONTRUST COMPANY, N.A.; BNY MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS CWALT, INC., ALTERNATIVE LOAN TRUST 2006-46, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-46 and all persons or entities unknown claiming any legal or equitable right, title, estate, lien or interest in the property described in the Complaint adverse to Plaintiff's title thereto, and DOES 1 through 25, based upon Defendants' non-disclosure and fraudulent concealment of material information relating to Defendants' Fixed Rate Mortgage ("FRM") loan documents, and in the accompanying required disclosure statements.

2.      The material facts that Defendants failed to disclose to Plaintiff before she entered into the subject FRM Loan, included:

- The monthly payment was far in excess of what they had promised her it would be;
- The initial interest rate was not the interest rate they had promised her;
- The loan was not a 30 year loan as they had promised her;
- The value of Plaintiff's home was overstated and, therefore, as Defendants intended, they effectively trapped Plaintiff in this loan.   (Hereinafter, the omitted facts referenced above shall be referred to as "Material Omissions").
- With reference to origination fraud allegations, all of Defendants' unfair, deceptive, and wrongful conduct in this case arises directly from the Material Omissions and deceptive partial representations.

/ / /

/ / /

**FIRST AMENDED COMPLAINT FOR ORIGINATION FRAUD AND WRONGFUL FORECLOSURE UNDER CC § 2923.5**

## II.

## THE PARTIES

3.      Plaintiff, SHARON BROTHERS ("Plaintiff"), is, and at all times herein mentioned, was a resident of the State of California, County of Santa Cruz.

4.      Plaintiff is informed and believes, and thereon alleges, that Defendant, BANK OF AMERICA, N.A., (hereinafter "BOFA") is, and at all times herein mentioned, was qualified to do business in the State of California and doing business in the above referenced judicial district. While specific acts and omissions referenced herein were and/or may have been committed by COUNTRYWIDE, liability, therefore, is imputed upon BOFA as their successor in interest. Defendant transacts business in Santa Cruz County, California and at all relevant times, originated, sold, and serviced FRM loans throughout the State of California, including Santa Cruz County, California.  Defendant has significant contacts with Santa Cruz County, California and the activities complained of herein occurred, in whole or in part, in Santa Cruz County, California.

5.      Plaintiff is informed and believes, and thereon alleges, that Defendant COUNTRYWIDE HOME LOANS, INC. (hereinafter "COUNTRYWIDE") is, and at all times herein mentioned, was qualified to do business in the State of California and doing business in the above referenced judicial district.  While specific acts and omissions referenced herein were and/or may have been committed by COUNTRYWIDE.  Defendant transacts business in Santa Cruz County, California and at all relevant times, originated and sold FRM loans throughout the State of California, including Santa Cruz County, California.  Defendant has significant contacts with Santa Cruz County, California and the activities complained of herein occurred, in whole or in part, in Santa Cruz County, California.

6.      Plaintiff is informed and believes, and thereon alleges, that Defendant, RECONTRUST COMPANY, N.A. (hereinafter "RECONTRUST") is, and at all times herein mentioned, was qualified to do business in the State of California and doing business in the above referenced judicial district.

7.      Plaintiff is informed and believes, and thereon alleges, that Defendant, BNY MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS CWALT, INC., ALTERNATIVE LOAN TRUST 2006-46, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-46 (hereinafter "BNY") is, and at all times herein mentioned, was qualified to do business in the State of California and doing business in the above referenced judicial district.

8.      Plaintiff is informed and believes, and thereon alleges, that each of the Defendants are responsible in some manner, either by act or omission, strict liability, fraud, deceit, fraudulent concealment, negligence, respondeat superior, joint venture principles, breach of contract or otherwise for the occurrences herein alleged, and that Plaintiff's injuries, as herein alleged were proximately caused by the conduct of Defendants.

9.      Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, each Defendant was acting in concert or participation with each other, or was a joint participant and collaborator with the others in the acts complained of, and/or was the agent or employee of the others in doing the acts complained of herein, each and all of them acting within the course and scope of said agency and/or employment by the others, each and all of them acting in concert one with the other and all together.  Each Defendant was the co-conspirator, agent, servant, employee, assignee, and/or joint venturer of each of the other Defendants and was acting within the course and scope of said conspiracy, agency, employment, assignment, and/or joint venture and with the permission and consent of each of the other Defendants.

10.      Plaintiff is ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 25 inclusive and, therefore, sues these Defendants by such fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously named Defendants are responsible in some manner for the injuries to Plaintiff alleged herein and that such injuries as herein alleged were proximately caused by such Defendants.

**FIRST AMENDED COMPLAINT FOR ORIGINATION FRAUD AND WRONGFUL FORECLOSURE UNDER CC § 2923.5**

11.    Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, that each of the Defendants were the agents, employees, partners, joint venturers, successors or predecessors in interest, owners, principals, and employers of the remaining Defendants, and in doing the things hereinafter alleged, were acting within the course and scope of such agency, partnership, employment, ownership, or joint venture. Plaintiff is further informed and believes and based thereon alleges, that the acts and conduct herein alleged of each such Defendant were known to, authorized by, and/or ratified by the other Defendants, and each of them.

12.    Whenever in this Complaint an act or omission of a corporation or business entity is alleged, the said allegation shall be deemed to mean and include an allegation that the corporation or business entity acted or omitted to act through its authorized officers, directors, agents, servants, and/or employees, acting within the course and scope of their duties, that the act or omission was authorized by corporate managerial officers or directors, and that the act or omission was ratified by the officers and directors of the corporation or business entity.

13.    Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned each of the Defendants were the agent and employee of the remaining Defendants, and in doing the things hereinafter alleged, were acting within the course and scope of such agency and employment.

14.    Plaintiff is not required to provide tender in this matter as this action attacks the validity of the underlying debt. Alleging tender would constitute an affirmation of the debt and thus it would be inequitable to require one.

### III.

### JURISDICTION AND VENUE

15.    This Court has jurisdiction over this matter pursuant to the California Constitution, Article XI, Section 10 and *California Code of Civil Procedure* ("CCP") §410.10 because Defendants transacted business and committed the acts complained of herein in California.

16.     The above-captioned Court is the Court with proper venue for this case as the Defendants entered into the underlying contract with Plaintiff in the above-referenced jurisdiction and the payment obligations are to be performed in the above-referenced jurisdiction.

## IV.

## FACTS COMMON TO ALL CAUSES OF ACTION

17.     Plaintiff, at all times relevant to this Complaint, was the owner of her primary residence commonly known as 31 Lincoln Street, Watsonville, California  95076. This property was purchased by Plaintiff in 1991 and was built by her father in 1961.  Plaintiff has lived in this home for over 30 years.  This home has been in Plaintiff's family since 1961 and will hereinafter be referred to as the "Subject Property" as is legally described as the short description consisting of:

**A PART OF THE LANS DESCRIBED IN THE DEED FROM JAMES A. WHITE TO GEORGE V.  FOSTER, RECORDED APRIL 6, 1927 IN VOLUME 80 OF OFFICIAL RECORDS, AT PAGE 112; AND BEGINNING AT A 10 INCH SPIKE DRIVEN ON THE PRODUCED CENTERLINE OF LINCOLN STREET WHICH POINT OF BEGINNING…MOST SOUTHERLY CORNER OF LANDS NOW OR FORMERLY OF MATSUOKA AND THENCE ALONG THE SOUTHEASTERLY LINE OF SAID LAST MENTIONED LANDS NORTH 48? 05' 45" EAST 129.00 FEET TO THE POINT OF BEGINNING.**

**A.P.N.: 017-273-20-000**

18.     On or about August 26, 2006, Plaintiff obtained a 40 year Fixed Rate Mortgage Loan from COUNTRYWIDE secured by a Deed of Trust in the amount of $560,000.00 for the Subject Property**.**  Plaintiff is informed and believes that the Deed of Trust was recorded on August 31, 2006 in Santa Cruz County, as instrument no. 2006-0051045.  A true and correct copy of the Deed of Trust, Note, and Truth and Lending Disclosure Statement ("TILDS") (collectively the "Loan Documents') pertinent to this action are attached hereto as Exhibit "A."

19.     In or about July 2006, Plaintiff had solicited a Mortgage Loan Specialist ("Agent") from COUNTRYWIDE inquiring about refinancing her current loan on the Subject Property.    Being a current COUNTRYWIDE Mortgage holder, Plaintiff called COUNTRYWIDE and they had referred her to COUNTRYWIDE Full Spectrum Lending in

FIRST AMENDED COMPLAINT FOR ORIGINATION FRAUD AND WRONGFUL FORECLOSURE UNDER CC § 2923.5

Salinas.  Plaintiff then went to COUNTRYWIDE Full Spectrum Lending in Salinas, where she was informed and assured that she would receive a 30 year Fixed Mortgage Loan with either a 3% or 4% interest rate because of being a current COUNTRYWIDE Mortgage holder and because of her good credit rating being over 650 FICO.

20.     At the time, Plaintiff had no idea that COUNTRYWIDE Full Spectrum Lending was a subprime division of COUNTRYWIDE.  This division of COUNTRYWIDE was for "Subprime Lending"; for people that have bad credit, income issues, etc.  If Plaintiff would have known this, she would have never signed the final Loan documents.

21.     Plaintiff went to COUNTRYWIDE Full Spectrum Lending in Salinas and met with an Agent. The Agent wrote down pertinent information as he asked Plaintiff questions from The Uniform Residential Loan Application.  During the course of the Application, the Agent asked Plaintiff what her place of employment and income was.  Plaintiff told the Agent that she was employed by AT&T and that her gross monthly income was approximately $4,703.00. When Plaintiff had told the Agent her income, he stated that he would decide how much income to put on the Loan Application, to make sure that the numbers work.  Plaintiff went back to COUNTRYWIDE before she signed her closing Loan documents 3 times to sign the corrected Loan Application, because COUNTRYWIDE said they did not know what income to use for her Loan qualification.

22.     The Agent did not ask Plaintiff for any type of income documentation, such as Tax returns, W2s, or pay check stubs which she would have provided as she did have them available.  Plaintiff, however, was asked to provide proof of employment approximately two weeks prior to signing the closing documents.  Plaintiff did provide proof of employment which reflected her annual income of $56,445.00.  At that time, Plaintiff went through the entire Application as the Agent wrote the answers to her questions.  See attached "Employment/Salary Verification", dated August 8, 2006, as Exhibit "B."

23.     During the loan process, Plaintiff never filled out, reviewed or signed a Loan Application until the day of closing the Loan.  The Agent from COUNTRYWIDE filled out the Loan Application.

**FIRST AMENDED COMPLAINT FOR ORIGINATION FRAUD AND WRONGFUL FORECLOSURE UNDER CC § 2923.5**

24.     Plaintiff believes that the Agent's sole motive in pushing her to refinance her Loan is that the Agent wanted to obtain as large a commission as possible.  Plaintiff was told that the Agent would accomplish this goal by persuading her to refinance the existing Loan so as to withdraw as much of her equity as possible.  In doing so, Agent suggested to Plaintiff that she should "cash out" as much equity as she could, over and above paying off the Loan, in order to "improve" the Subject Property.  The Agent said that the Loan was called a Home Improvement Loan and that is what Plaintiff qualified for.

25.     On or about August 31, 2006, Plaintiff went to COUNTRYWIDE in Salinas for the purpose of closing the Loan transaction.  When Plaintiff saw the rate and payment, she asked the Agent why the payment and rate were different than initially discussed.  The Agent told Plaintiff not to worry because she would be able to refinance in a short period of time if she had difficulty making the monthly payment and there was no prepayment penalty.   Plaintiff was further told that she qualified for a 2nd Trust Deed HELOC "Home Equity Line of Credit" just in case she couldn't afford the 1st Trust Deed mortgage payments and that Plaintiff would have that extra money to pay the mortgage payment.  The Agent told Plaintiff that's why she needed the additional Loan "just in case."    Originally, Plaintiff had no intentions in obtaining a 2nd Mortgage Loan on her home.

26.     Plaintiff was directed by the Agent to sign the Documents in a very short period of time.  She spent approximately fifteen minutes with the notary.  Plaintiff felt pressured into "closing" the Loan, since she had no time to read or understand the documents whatsoever. The documents were clipped together from the top and Plaintiff did not have the opportunity to review the covered documents.  In addition, Plaintiff had never received a Good Faith Estimate any time after the initial Loan Application to review the fees, interest rate, terms, etc.  Relying on the Agent's previous representations, Plaintiff signed the Loan Agreements without being clear as to what she was signing; even the terms of the loan.  At the time of signing, Plaintiff noticed there were closing documents for the HELOC; the Loan that the Agent had suggested to her during the initial Loan Application.  However, Plaintiff never agreed to the HELOC.  The Agent said that she needed the HELOC and it was in her best interest.  The Agent also told Plaintiff that

she would be able to re-finance in a short period of time if she could not afford the payment. Based on the Agent's statement and representation, Plaintiff signed the Documents.

27.    After the Loan closed, Plaintiff received a check for approximately $94,000.00. Plaintiff immediately went to COUNTRYWIDE in Salinas to ask why she received so much money back and to go over her Loan with the Agent.  When Plaintiff got there, the windows were boarded up and a sign was on the building stating that the office had been closed.  Plaintiff then called COUNTRYWIDE for an explanation and a representative confirmed that it was closed and that she had to communicate with customer service at that point.

28.    At the time of closing the Loan, the following facts were not disclosed to Plaintiff and Plaintiff had no reason to discover these facts until reviewing her loan in the last year in conjunction with this action:

     a.  On the Loan Application filled out by the Agent, Plaintiff's base income was listed as $9,500.00 monthly gross; Plaintiff's financial information was available to the Agent and the Agent knew her true monthly gross income was $4,703.00, as she had stated to him and provided employment verification with income verification during the initial Application. Plaintiff only discovered that the Loan Application contained an inflated income in reviewing her documents with her counsel in the last year.  See attached, "Uniform Residential Loan Application" as Exhibit "C";

     b.  The document 4506-T was signed by Plaintiff for the purpose of verifying Plaintiff's income, but the document was never submitted to the Internal Revenue Service to confirm her income.   See attached, "4506-T" as Exhibit "D";

     c.  Plaintiff was never told this Mortgage Loan was a 40 yr. fixed Loan, but was always told she was receiving a 30 yr. fixed Loan.  She did not discover that her loan was a 40 year loan;

     d.   The value of Plaintiff's home was overstated at $700,000.00.   Plaintiff is informed and believes the appraisers represented the value of what they

**FIRST AMENDED COMPLAINT FOR ORIGINATION FRAUD AND WRONGFUL FORECLOSURE UNDER CC § 2923.5**

wanted the Subject Property to be worth in order to qualify Plaintiff for the Loan, when the actual value of the Subject Property was far less. As a result, Plaintiff has lost all equity in the Subject Property. COUNTRYWIDE Full Spectrum Lending requested a review for consideration of increased value from Land safe. It was approved. See attached, "Landsafe Value Opinion" document, which increased the value from $672,000.00 to $700,000.00, as Exhibit "E". In addition, see attached "Appraisal," as Exhibit "F";

e. That the Interest Rate on the Loan was 6.375%, when Plaintiff was told it would be between 3% or 4%;

f. The fees Plaintiff paid to close this Loan were erroneous; she would have never signed the documents, if she was aware of the following costs incurred to procure the Loan:

   1. Loan Discount: 4.375% = $24,500.00

   2. Pmt to PAC Cdt Svc c/o Sharon Brothers: $1,013.00

   3. Interest to Payoff Mortgage Loan: $6,855.19

   4. Late Charge to Payoff Mortgage Loan: $325.80

   5. Prepayment penalty: $15,638.40

   6. Total to Refinance just in FEES: $48,332.39

      (See attached, "Final Closing Statement" and

      "Deductions from Fund Check" as Exhibit "G" collectively)

g. The Second Trust Deed Payment added into the payment, without Plaintiff's consent, an additional $288.75/month.

29.    About July 30, 2009, Plaintiff was informed that BOFA, through its alleged trustee, RECONTRUST, recorded a Notice of Trustee's Sale on the Subject Property. Prior to that date, Plaintiff did not receive any communications or options from BOFA to assist her in saving her home.

**FIRST AMENDED COMPLAINT FOR ORIGINATION FRAUD AND WRONGFUL FORECLOSURE UNDER CC § 2923.5**

30.    Plaintiff has lived in her home for over 30 years and does not want to ever lose her home.  Plaintiff's father had built this home in 1961 and her home has been in the family since that year.  In November 2008, Plaintiff started calling COUNTRYWIDE for any options and/or assistance and direction as to lowering her payment. COUNTRYWIDE explained that Plaintiff was ineligible for loan modification assistance because she was current on her Mortgage Loan.  COUNTRYWIDE stated that she had to be behind on her Mortgage payments before she would be able to qualify for any type of assistance.  Plaintiff had never been late on her Mortgage payment since she had purchased her home.   Relying on COUNTRYWIDE's representations, Plaintiff stopped paying her Mortgage in order to receive assistance.

31.    Plaintiff hired 3 different Modification companies assist her in the Loan Modification process.  She kept in communication with the Agencies that she hired to ensure success in the Loan Modification process.  Plaintiff was not going to give up.  Plaintiff provided all documentation to BOFA through the representatives she had hired and complied with all demands.

32.    After receiving the first NOD in April 2009, Plaintiff offered to make a single payment worth three months of her unmodified mortgage payments.  However BOFA refused her payment and informed Plaintiff that no partial payments would be accepted and that full payment of all past due amounts would only be accepted (approximately $17,000.00).

33.    After months of attempts, BOFA finally offered Plaintiff a three month Trial Modification (HAMP) and she made monthly payments for 6 months in the amount of $2,153.30 from August 2009 to January 2010.  Plaintiff continued to contact BOFA as to the progress of her permanent Loan Modification.  Plaintiff then received the Permanent Modification Offer, which was an adjustable payment schedule, which ended up being $2,015.59 per month for the first five years.  Additionally, Plaintiff was responsible for the unmodified second loan payment of approximately $700.00 per month.  Plaintiff could not afford the payments at all because her monthly income at the time was less than $4000.00 per month and the payments required amounted to over $2,700.00 per month.

**FIRST AMENDED COMPLAINT FOR ORIGINATION FRAUD AND WRONGFUL FORECLOSURE UNDER CC § 2923.5**

34.     Defendants knew at Plaintiff's age and income that such a payment was unaffordable and that offering Plaintiff such a permanent loan modification was unconscionable and self-serving, only forcing Plaintiff further into foreclosure and accumulating more fees, interest and penalties on behalf of Defendants.

35.     Plaintiff was offered a second three month Loan Modification Trial Plan in 2011. The BOFA representative, Cynthia Figueroa (phone: (800) 405-0078) **promised Plaintiff that if she successfully completed the Trial Plan, BOFA would then offer her a reasonable modification**. Plaintiff timely made all three trial payments of $2293.37, but no permanent Loan Modification was offered at the end of the trial payment period.

36.     Plaintiff has exhausted every effort with BOFA to consider her for a reasonable Loan Modification.

37.     During the past 19 months, an inspector from BOFA, named Jason, has come to Plaintiff's home once a month to see if she lives there and BOFA charges Plaintiff monthly for this. Plaintiff called BOFA when he started coming to her home and BOFA said that it is mandatory for him to verify that she lives in the home. Plaintiff has never heard of this, has found no authority in her note, deed of trust or any authorization for such charges and finds it very disturbing and intrusive.

38.     On or about April 16, 2009, BOFA, through its alleged trustee, RECONTRUST recorded a Notice of Default (hereinafter "NOD") on the Subject Property. A Notice of Trustee's Sale (hereinafter "NOTS") was subsequently recorded on December 20, 2010 and again on April 18, 2011.

39.     Plaintiff has been residing in her home for almost 30 years and wishes to continue to do so.

40.     Plaintiff is asking the Court to stay all foreclosure proceedings and to order BOFA to enter into negotiations with her in the hope of consummating a Loan Modification agreement beneficial to all parties. Plaintiff is willing to make good faith payments that the Court may order during the period that the Court enjoins the foreclosure sale.

/ / /

**FIRST AMENDED COMPLAINT FOR ORIGINATION FRAUD AND WRONGFUL FORECLOSURE UNDER CC § 2923.5**

## CALIFORNIA SUCCESSOR LIABILITY LAW

41.     Under California law, successor liability may be imposed on a corporation for the debts and liabilities of its predecessor in any of the following circumstances: (1) the purchaser expressly or impliedly agrees to such assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is merely a continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape liability for debts. *Ray v. Alad Corp.* (1977) 19 Cal.3d 22, 28; *Westoil Terminals Co. v. Harbor Ins. Co.* (1999) 73 Cal.App.4th 634, 638; *Franklin v. USX Corp.* (2001) 87 Cal.App.4th 615, 620.

42.     "It is the general rule that a corporation formed by consolidation or merger is answerable for all the debts and liabilities of the constituent corporations, whether they arise ex contractu or ex delicto." *Moe v. Transamerica Title Ins. Co.* (1971) 21 Cal.App.3d 289, 304. Once the merged entity holds the liabilities of its predecessor, it is axiomatic that it cannot extinguish through contracts with one party debts or obligations it owes to a third party who is a stranger to the contract.

43.     The act of merging establishes a basis of successor liability. *Petrini v. Mohasco Corp.* (1998) 61 Cal.App.4th 1091, 1094. This is true regardless of whether a business or other asset acquired through the merger had assets--the "surviving corporation under a statutory merger is responsible for the liabilities of the merged corporation under both common law and statute" regardless of whether those liabilities are known or unknown at the time of the merger. *Id.* at 1097 & 1098-1099.

44.     Other agreements between merging entities, subsidiaries, etc., that contractually assign rights or responsibilities from one corporation to another do not relieve the transferor of its obligations *to third parties who are not a party to those contracts* from the obligations that the transferor incurs, regardless of when or how the obligation arises.

45.     Successor liability through merger arises by operation of law, and obligations to unrelated third parties incurred by predecessor entities are not extinguished through assignment or assumption contracts between two parties.

46.     It is acknowledged, that in the State of California, the issue of successor-in-interest liability is "extremely fact sensitive." *See* e.g., William P. O'Neill, *Advanced Issues In Strategic Alliances,*1193 PLI/Corp. 351, 391 (July 2000) [discussing the joint venture's liability for Venturer A's obligations prior to the joint venture's acquisition of Venturer A's business].

47.     It has been held that a successor in interest is, generally, a person or entity who comes into possession of the rights of another in a particular tangible or intangible property. As stated in *Perez v. 222 Sutter St. Partners* (1990) 222 Cal.App.3d 938 "'[s]uccessor in interest' is defined as: '[o]ne who follows another in ownership or control of property. In order to be a 'successor in interest,' a party must continue to retain the *same rights* as original owner ... and there must be *change in form only and not in substance ....'''  Perez,* at p. 948, fn. 8, *quoting* Black's Law Dict. (5th ed. 1979) p. 1283, col. 2; *see also Estate of Yates* (1994) 25 Cal.App.4th 511, 522; *Marks v. Minnesota Mining & Manufacturing Co.* (1986) 187 Cal.App.3d 1429, 1435 [successor liability found based on de facto merger]; *Moe v. Transamerica Title Ins. Co.* (1971) 21 Cal.App.3d 289.

48.     Defendant, BOFA, is the successor in interest to lender Defendant COUNTRYWIDE and, therefore, incurs all such liability for COUNTRYWIDE as to the allegations in this Complaint.

## CALIFORNIA CIVIL CODE SECTION 2923.5

49.     *Civil Code* §2923.5 also contains additional requirements that lenders, mortgagees, trustees, beneficiaries, or authorized agents must comply with prior to filing a Notice of Default pursuant to *California Civil Code* §2924.  This section requires the lender to contact the borrower in person or by telephone in order to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure.  During the initial contact, the lender shall advise the borrower that he or she has the right to request a subsequent meeting

and, if requested, the mortgagee, beneficiary, or authorized agent shall schedule the meeting to occur within 14 days.  The assessment of the borrower's financial situation and discussion of options may occur during the first contact, or at the subsequent meeting scheduled for that purpose.  In either case, the borrower shall be provided the toll-free telephone number made available by the United States Department of Housing and Urban Development (HUD) to find a HUD-certified housing counseling agency.

50.    *Civil Code* §2923.5 further requires that the lender may not file a Notice of Default until 30 days after this contact and good faith discussion takes place.

51.    *Civil Code* §2923.5 mandates that the Lender make a good faith effort to evaluate the borrower's financial situation and explore the borrowers' options to stay in their home.

52.    In addition, *Civil Code* §2923.5(c) provides that if a mortgagee, trustee, beneficiary, or authorized agent has filed a notice of default prior to the enactment of §2923.5, then the mortgagee, trustee, beneficiary, or authorized agent, must, in the notice of sale, include a declaration that states (1) the borrower was contacted to assess the borrower's financial situation and to explore options for the borrower to avoid foreclosure, or (2) list the efforts made, if any, to contact the borrower in the event the contact was made; and this declaration must comply with *California Code of Civil Procedure* §2015.

53.    Based on the intent of Senate Bill 1137, Plaintiff contends *Civil Code* §2923.5 requires a discussion concerning the possibility of avoiding foreclosure or modifying the current mortgage so, in these times, the borrower could actually explore the possibilities of avoiding foreclosure and not receive merely a cursory phone call assessing the borrower's financial situation.

**FIRST CAUSE OF ACTION**
**FRAUD IN ORIGINATION OF LOAN**
**(Against all Defendants)**

54.    Plaintiff hereby realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

55.     The FRM Loan that is the subject of this Complaint is a Loan designed by Defendants, which is a forty (40) year loan with payments and interest much higher than originally represented to Plaintiff.

56.     Plaintiff alleges that the monthly payment of $3,673.91 was represented to her as a payment having a thirty (30) year loan term.  However, Defendants did not disclose to Plaintiff that the Loan was a forty (40) year loan term.  In addition, Defendants represented to Plaintiff that the interest rate would be 3 or 4% when, in fact, the real interest rate was and is 6.375%. Plaintiff was *not* provided, before entering into the Loan, with any of this information.  This knowledge was critically important information because without this withheld information, Plaintiff could not make an informed decision as to whether to enter into the Loan or not.

57.     Plaintiff was also pressured into signing the Loan Documents for the HELOC in which Defendants informed Plaintiff that this Loan would help her make mortgage payments on her first Loan.

58.     As set forth in the preceding paragraphs, Defendants intentionally, willfully, and wantonly engaged in these acts with the purpose of deceiving Plaintiff into entering into an unaffordable Loan, including the Material Omissions, with the intended consequence of inducing her to part with her real and personal property.

59.     Defendants engaged in the unlawful suppression of facts or circumstances by one of the parties to a contract from the other, for self-serving purposes and financial gain, which in justice ought to be made known.

60.     Plaintiff only recently discovered Defendants' unlawful suppression of facts and intentional acts of deception when Plaintiff reviewed her Loan documents, within the last year.

61.     Plaintiff is informed and believes, and thereon alleges, that the Application, which she never filled out or signed, was falsified, in terms of her income being artificially inflated so that she could qualify for the Loan.

FIRST AMENDED COMPLAINT FOR ORIGINATION FRAUD AND WRONGFUL FORECLOSURE UNDER
CC § 2923.5

62.     Defendants never asked Plaintiff to provide copies of her income.    Plaintiff informed Defendants that her monthly income was only $4,703.00 and provided a verification of such, which is completely contrary to the Loan Application.

63.     Plaintiff is informed and believes, and thereon alleges, that Defendants were not actually interested in verifying Plaintiff's income or obtaining actual knowledge of Plaintiff's actual income prior to overstating Plaintiff's income on the Loan Application because they knew that Plaintiff could never qualify for the Loan based upon her then-current income.

64.     Plaintiff asserts that income information provided by Plaintiff was enough, in addition to the Application itself, for Defendants to know what type of Loan should be offered, and what Plaintiff could not afford.  Although Plaintiff is unaware of whether a credit application was obtained by Agent, Plaintiff asserts that any falsification of a credit application by a broker or seller for the purpose of securing a loan is de facto fraud.

65.     Plaintiff is informed and believes, and thereon alleges, that the purpose of entering into the above described Loan transaction was for Plaintiff to refinance her then current loan with COUNTRYWIDE on the Subject Property.  As a result of Defendants' wrongdoing in inflating Plaintiff's income and qualifying Plaintiff for a Loan product that she could not afford, Plaintiff has suffered unnecessary severe financial hardship.

66.     Plaintiff disputes the alleged amount owed to Defendants as the Loan was procured by fraud.

67.     Because the Loan was procured by fraud, and as a result of Defendants' wrongful conduct, Plaintiff is entitled to damages, including but not limited to all interest paid Defendants by Plaintiff on the fraudulently procured Loan, in addition to all fees, penalties, and any other amounts charged by Defendants to Plaintiff.

68.     Based upon Defendant's intentional fraudulent acts of overstating Plaintiff's income without her knowledge and Defendant's fraudulent concealment regarding the Material Omissions and the details of the Loan as set forth herein, Plaintiff is also entitled to rescind the Loan.

**FIRST AMENDED COMPLAINT FOR ORIGINATION FRAUD AND WRONGFUL FORECLOSURE UNDER CC § 2923.5**

69.   As a proximate result of Defendants' wrongful conduct, Plaintiff has been damaged in the amount of ongoing penalties, fees and interest charged by Defendants, including but not limited to a penalty of 5% for any overdue payment of principal and interest not received in full by the end of fifteen (15) calendar days after the date it was due.  The Notice of Default recorded April 16, 2009, stated that Plaintiff's account was past due in the amount of $18,010.86 as well as interest and late charges, which continue to accrue since that time.

70.   Plaintiff justifiably relied on Defendants' deception, which was the actual and proximate cause of Plaintiff's damages, in excess of  $150,0000.00, and such further relief as is set forth below in the section captioned Prayer for Relief, which is by this reference incorporated herein.

## SECOND CAUSE OF ACTION
### TO SET ASIDE TRUSTEE SALE DATE BASED ON WRONGFUL FORECLOSURE IN VIOLATION OF SECTION 2923.5
### (Against All Defendants)

71.    Plaintiff hereby realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

72.    On or about April 16, 2009, Defendants initiated a non-judicial foreclosure proceeding on Plaintiff's residence by causing to record a NOD and Election to Sale under Deed of Trust.

73.    Plaintiff alleges that Defendants authorized and/or initiated this foreclosure proceeding without first contacting Plaintiff, as was its duty pursuant to *Civil Code* §2923.5.

74.    Pursuant to *California Civil Code* §2924(b), Defendants, and each of them, had an obligation to send Plaintiff by certified mail a copy of the duly recorded Notice of Default. However, *California Civil Code* §2923.5 requires that the Notice of Default have an attached Declaration that complied with the requirements of *California Code of Civil* Procedure §2015.5, in addition to the requirements described above in this Complaint.

75.    *California Civil Code* §2923.5(b) and (g)(1)(2)(A)(B)(C)(3)(4)(5) require a lender to conduct "due diligence" by: attempting to contact the borrower first by a first class letter that

includes a toll-free number for HUD to find a HUD-certified housing counseling agency; after the letter has been sent to contact the borrower by telephone at least three times, at three hours and on different days; attempting to contact the borrower with an automated system that connects borrowers to a live representative; send a certified letter to the borrower with return receipt requested if borrower does not respond within two weeks; provide a means for the borrower to contact the Lender in a timely manner; and post a prominent link on the homepage of the Internet Web site.

76.     *California Civil Code* §2924(f)(b)(1) requires that "[n]otice of the sale thereof shall be given by posting a written notice of the time of sale and of the street address and the specific place at the street address where the sale will be held, and describing the place to be sold, at least 20 days before the date of sale…and publishing a copy once a week for three consecutive calendar weeks, the first publication to be at least 20 days before the date of sale…"

77.     Plaintiff is informed and believes Defendants did not send Plaintiff a first class letter that includes a toll-free number for HUD to allow the borrower to find a HUD-certified housing counseling agency.

78.     Defendants did not attempt to contact Plaintiff by telephone at least three times, at three hours, and on different days prior to filing the Notice of Default on the Subject Property.

79.     Plaintiff is informed and believes Defendants did not send a certified letter to Plaintiff with return receipt requested prior to recording the Notice of Default on the Subject Property.

80.     Thus, Defendants did not fulfill the substantive obligations imposed upon them, as Lenders, by the legislature in the applicable code sections set forth above prior to the recording of the Notices of Default.

81.     The filing of the Notice of Default should never have been recorded and the act of recording was in violation of the applicable code sections set forth above.  No Notice of Default should have been recorded prior to a good faith effort being made by the Lender to contact Plaintiff and explore alternatives to foreclosure.

82.     As a result of the above acts or omissions, Defendants have violated *Civil Code* §2923.5 prior to their filing of the Notice of Default pursuant to *Civil Code* §2924.  This violation makes the foreclosure and sale of Plaintiff's residence wrongful, improper, and illegal under California law.

83.     Defendants' actions were against public policy because the legislature enacted this provision to slow the process of foreclosures in order for foreclosures to be avoided.

84.     Defendants failure to comply with *Civil Code* §2923.5 greatly prejudiced Plaintiff's rights of un-encumbering her Property or refinancing her Property in that Plaintiff was not properly noticed of the foreclosure pending on her Property.

85.     As a result of these wrongful acts and omissions, Plaintiff was not properly notified of the pending foreclosure process that was instituted in violation of *Civil Code* §§2924(b) and 2923.5.

86.     As a result of these wrongful acts and omissions, Plaintiff has been precluded from properly curing any default in her mortgage and also from all the rights and benefits that go along with a person's ability to own and reside in a home.

87.     As a result of these wrongful acts and omissions, Plaintiff has been precluded from benefiting from the rights granted by *Civil Code* §§2924(b) and 2923.5, in being contacted by her lender with due diligence in an attempt to modify her current Loan to a principal amount and an interest rate which she could not only afford, but would allow her to stay in her home.

88.     Plaintiff is entitled to injunctive relief prohibiting Defendants from exercising the power of sale in violation of *Civil Code* §2923.5 and requiring Defendants to comply with Civil Code §2923.5 and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

///

///

///

FIRST AMENDED COMPLAINT FOR ORIGINATION FRAUD AND WRONGFUL FORECLOSURE UNDER CC § 2923.5

### THIRD CAUSE OF ACTION
### TO SET ASIDE TRUSTEE SALE DATE BASED ON WRONGFUL
### FORECLOSURE IN VIOLATION OF SECTION 2924
### (Against All Defendants)

89.     Plaintiff hereby realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

90.     On or about April 16, 2009, Defendants initiated a non-judicial foreclosure proceeding on Plaintiff's residence by causing to record a NOD and Election to Sale under Deed of Trust.

91.     Pursuant to California *Civil Code* §2924(b), Defendants, and each of them, had an obligation to send Plaintiff by certified mail a copy of the duly recorded Notice of Default. However, California *Civil Code* §2923.5 requires that the Notice of Default have an attached Declaration that complied with the requirements of California *Code of Civil* Procedure §2015.5, in addition to the requirements described above in this Complaint.

92.     California *Civil Code* §2924(g)(2) states that "[i]f the sale proceedings are postponed for a period or periods totaling more than 365 days, the scheduling of any further sale proceedings shall be preceded by giving a new notice of sale in the manner prescribed in Section 2924f."

93.     California *Civil Code* §2924(f)(b)(1) requires that "[n]otice of the sale thereof shall be given by posting a written notice of the time of sale and of the street address and the specific place at the street address where the sale will be held, and describing the place to be sold, at least 20 days before the date of sale…and publishing a copy once a week for three consecutive calendar weeks, the first publication to be at least 20 days before the date of sale…"

94.     Plaintiff is informed and believes Defendants recorded the NOD which is dated April 16, 2009 and the initial Notice of Trustee's Sale which is dated December 20, 2010.  The sale proceedings have been postponed for a period or periods totaling more than 365 days. However, the scheduling of any further sale proceedings was not preceded by giving a new notice of sale in violation of Section 2924f.

95.     The filing of the Notice of Default should never have been recorded and the act of recording was in violation of the applicable code sections set forth above.  No Notice of Default should have been recorded prior to a good faith effort being made by the Lender to contact Plaintiff and explore alternatives to foreclosure.

96.     The signature on the Notice of Default recorded on April 16, 2009 contains a signature by an "Anselmo Pagkaliwangan," a notorious "robo-signature".

97.     A "robo-signature" is a notorious method of dealing with thousands of documents with limited staff, whereby an electronic signature, or sometimes an actual signature is affixed to a document purporting to show an officer of Defendant has signed off on some action. Further, the phony signature purports to verify the signer has reviewed the document and is attesting to the accuracy of the statements contained therein. Defendants' use of these phony "robo-signatures" has been widely publicized around the country and been the basis for action against Defendants by virtually every state's Attorney General.   The use of the robo-signatures on these documents is further evidence of the lack of authenticity of the statements set forth therein.

98.     As a result of the above acts or omissions, Defendants have violated *Civil Code* §2923.5 prior to their filing of the Notice of Default pursuant to *Civil Code* §2924.  This violation makes the foreclosure and sale of Plaintiff's residence wrongful, improper, and illegal under California law.

99.     Defendants' actions were against public policy because the legislature enacted this provision to slow the process of foreclosures in order for foreclosures to be avoided.

100.    Defendants failure to comply with *Civil Code* §2923.5 greatly prejudiced Plaintiff's rights of un-encumbering her Property or refinancing her Property in that Plaintiff was not properly noticed of the foreclosure pending on her Property.

101.    As a result of these wrongful acts and omissions, Plaintiff was not properly notified of the pending foreclosure process that was instituted in violation of *Civil Code* §§2924(b) and 2923.5.

**FIRST AMENDED COMPLAINT FOR ORIGINATION FRAUD AND WRONGFUL FORECLOSURE UNDER**
**CC § 2923.5**

102.    As a result of these wrongful acts and omissions, Plaintiff has been precluded from properly curing any default in her mortgage and also from all the rights and benefits that go along with a person's ability to own and reside in a home.

103.    As a result of these wrongful acts and omissions, Plaintiff has been precluded from benefiting from the rights granted by *Civil Code* §§2924(b) and 2923.5, in being contacted by her lender with due diligence in an attempt to modify her current Loan to a principal amount and an interest rate which she could not only afford, but would allow her to stay in her home.

104.    Plaintiff is entitled to injunctive relief prohibiting Defendants from exercising the power of sale in violation of *Civil Code* §2923.5 and requiring Defendants to comply with Civil Code §2923.5 and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

### FOURTH CAUSE OF ACTION
### VIOLATION OF SECTION 2923.6
### (Against All Defendants)

105.    Plaintiff hereby realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

106.    Defendants' Pooling and Servicing Agreement (hereinafter "PSA") contains a duty to maximize net present value to its investors and related parties.

107.    *California Civil Code* § 2923.6 broadens and extends this PSA by providing that the mortgagee, beneficiary, or authorized agent offer the borrower a Loan Modification or workout plan if such a Modification or plan is consistent with its contractual or other authority.

108.    Pursuant to California *Civil Code* § 2923.6(a), a servicer acts in the best interest of all parties if it agrees to or implements a Loan Modification where (1) the Loan is in payment default, and (2) the anticipated recovery under the Loan Modification or workout plan exceeds the anticipated recovery through foreclosure on a net present value basis.

109.    California *Civil Code* 2923.6(b) now provides that the mortgagee, beneficiary, or authorized agent offer the borrower a Loan Modification or workout plan if such a Modification or plan is consistent with its contractual or other authority.

110.    Since November 2008, Plaintiff has requested assistance and sought a Loan Modification from Defendants.  As mentioned above, Plaintiff did receive a trial Modification and thereafter was offered a permanent Modification, one of which Defendant knew was unaffordable.  Since being offered the unaffordable permanent Modification, Defendants have thwarted Plaintiff's attempts at any subsequent permanent Loan Modification by diverting phone calls, providing misleading and inconsistent information, losing correspondence, and extensive delays.

111.    Plaintiff's Loan is presently in an uncertain state.

112.    The Joint Economic Committee of Congress estimated in June 2007, that the average foreclosure results in $77,935.00 in costs to the homeowner, lender, local government, and neighbors.

113.    Of the $77,935.00 in foreclosure costs, the Joint Economic Committee of Congress estimates that the lender will suffer $50,000.00 in costs in conducting a non-judicial foreclosure on the property, maintaining, rehabilitating, insuring, and reselling the property to a third party.  Freddie Mac places this loss higher at $58,759.00.

114.    Plaintiff is willing, able, and ready to execute a Modification of her Loan on a reasonable basis.

115.    The anticipated recovery of a Loan Modification, in which the interest rate is reduced and the term is extended, will likely result in a Modification which is affordable to Plaintiff and which exceeds the anticipated recovery through a foreclosure sale.

116.    The filing of the Notice of Default should never have been recorded, and the act of recording was in violation of the applicable code sections set forth above.  No Notice of Default should have been recorded prior to a good faith effort being made by the lender to contact Plaintiff and explore a permanent Loan Modification because Plaintiff's Loan was in default.

117.    As a result of the above acts or omissions, Defendants have violated *Civil Code* §2923.6 prior to their filing of the Notice of Default.  This violation makes the foreclosure and sale of Plaintiff's residence wrongful, improper, and illegal under California law.

118.    Defendants' actions were against public policy because the legislature enacted this provision to slow the process of foreclosures in order for foreclosures to be avoided.

119.    As a result of these wrongful acts and omissions, Plaintiff has been precluded from properly curing any default in her mortgage and also from all the rights and benefits that go along with a person's ability to own and reside in a home.

120.    As a result of these wrongful acts and omissions, Plaintiff has been precluded from benefiting from the rights granted by *Civil Code* § 2923.6 because she was not offered a permanent Loan Modification by her lender that she could afford and would allow her to stay in her home.  Additionally, a Loan Modification would be efficient and prevent waste because Defendants would receive a greater return through a Loan Modification than through a foreclosure sale of Plaintiff's Property.

121.    Plaintiff is entitled to injunctive relief prohibiting Defendants from exercising the power of sale in violation of *Civil Code* §2923.6 and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

## FIFTH CAUSE OF ACTION
### VIOLATION OF RESPA
### (Against all Defendants)

122.    Plaintiff hereby realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

123.    An actual controversy has arisen and now exists between Plaintiff and Defendants regarding their respective rights and duties, in that Plaintiff contends that Defendants did not properly comply with proper delivery procedures under RESPA.

124.    Plaintiff sent Defendants a qualified written requests ("QWR") on or about January 26, 2012.  Plaintiff also sent Defendants a validation of debt ("VOD") on or about January 26, 2012.  Each request is permitted under 12 U.S.C §2601 et seq.  Defendants failed to respond at all to Plaintiff's QWR and VOD.

125.    By Defendants' failure to properly respond to Plaintiff's QWRs and VOD, Defendants have failed to provide Plaintiff with proof of the debt allegedly owed to Defendants.

126.    Plaintiff requests that this Court find the purported power of sale contained in the Loan of no force and effect at this time, because Defendants' actions in the processing, handling, and attempted foreclosure of this Loan has contained violations of regulations created to protect borrowers, which has directly caused Plaintiff to be at an equitable disadvantage to Defendants. Plaintiff further requests that title to the Subject Property remain in Plaintiff's name, with said Deed of Trust remaining in beneficiaries' name, during the pendency of this litigation.

127.    As a proximate result of Defendants' actions, Plaintiff has been damaged in the amount of ongoing penalties, fees, and interest charged by Defendants, including but not limited to a penalty of 5% for any overdue payment of principal and interest not received in full by the end of fifteen (15) calendar days after the date it was due.  The Notice of Default dated April 16, 2009, stated that Plaintiff's account was past due in the amount of $18,010.86, including principal and interest and late charges, which continue to accrue since that time.

128.    In addition, as a result of Defendant's pattern of noncompliance with the requirements of this section, Plaintiff seeks additional damages, as the court may allow, as set forth in 12 U.S.C. §2605(f)(2)(B).

129.    Further, Defendants' actions have been willful, knowing, and malicious, entitling Plaintiff to punitive damages in an amount appropriate to punish Defendants and to deter others from engaging in the same behavior.

130.    Plaintiff is entitled to such relief as is set forth in this Cause of Action, including damages in excess of $150,000.00, and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

## SIXTH CAUSE OF ACTION
### BREACH OF CONTRACT
#### (Against All Defendants)

131.    Plaintiff hereby realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

132.    In or around November 2008, Plaintiff contacted COUNTRYWIDE/BOFA to inquire about any assistance options available to her.  She was informed numerous times by COUNTRYWIDE/BOFA that she would not be eligible for any type of assistance until she was in default on her loan.

133.    Finally, in reliance on COUNTRYWIDE/BOFA's representation, Plaintiff defaulted on her loan and contacted COUNTRYWIDE/BOFA for assistance.

134.    Plaintiff hired 3 different Modification companies to assist her in the Loan Modification process.  She kept in communication with the Agencies that she hired to ensure success in the Loan Modification process.  Plaintiff was not going to give up.  Plaintiff provided all documentation to COUNTRYWIDE/BOFA through the representatives she had hired and complied with all demands.

135.    After receiving the first NOD in April 2009, Plaintiff offered to make a single payment worth three months of her unmodified mortgage payments.  However, the customer service representative told Plaintiff that no partial payments would be accepted and that only full payment of all past due amounts would be accepted (approximately $17,000.00).  Plaintiff was prevented from tendering a partial payment.

136.    After months of attempts, BOFA finally offered Plaintiff a three month Trial Modification (HAMP) and she made monthly payments for 6 months in the amount of $2,153.30 from August 2009 to January 2010.  Plaintiff continued to contact BOFA as to the progress of her permanent Loan Modification.  Plaintiff then received the Permanent Modification Offer, which was an adjustable payment schedule, which ended up being $2,015.59 per month for the first five years.  Additionally, Plaintiff was responsible for the unmodified second loan payment of approximately $700.00 per month.

137.    Plaintiff was offered a second three month Loan Modification Trial Plan in 2011. The BOFA representative, Cynthia Figueroa (phone: (800) 405-0078 promised Plaintiff that if she successfully completed the Trial Plan, BOFA would then offer her a reasonable modification.  Plaintiff timely made all three trial payments of $2293.37, but no permanent Loan Modification was offered at the end of the trial payment period as promised.

FIRST AMENDED COMPLAINT FOR ORIGINATION FRAUD AND WRONGFUL FORECLOSURE UNDER
CC § 2923.5

138.    Plaintiff has exhausted every effort with BOFA to consider her for a reasonable Loan Modification.

139.    Defendants breached their oral promise to offer a permanent loan modification after Plaintiff successfully completed the 2011 trial loan modification plan.

140.    As a proximate result of Defendants' breaches, Plaintiff faces the permanent loss and eviction from her home and thereby has suffered, and will continue to suffer, general and special damages in an amount according to proof at trial in excess of $100,000.00, and such further relief as is set forth below in the section captioned Prayer for Relief, which is by this reference incorporated herein.

**SEVENTH CAUSE OF ACTION**
**BREACH OF IMPLIED COVENANT OF**
**GOOD FAITH AND FAIR DEALING**
**(Against all Defendants)**

141.    Plaintiff hereby realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

142.    Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.  This implied covenant of good faith and fair dealing requires that no party will do anything that will have the effect of impairing, destroying, or injuring the rights of the other party to receive the benefits of their agreement.  The covenant implies that in all contracts each party will do all things reasonably contemplated by the terms of the contract to accomplish its purpose.  The covenant protects the benefits of the contract that the parties reasonably contemplated when they entered into the agreement.

143.    The terms of the Loan imposed upon Defendants a duty of good faith and fair dealing in this matter.

144.    Defendants enjoyed substantial discretionary power affecting the rights of Plaintiff during the events alleged in this Complaint.  Defendants were required to exercise such power in good faith.

145.    Defendants negligently and/or willfully breached the implied covenant of good faith and fair dealing with Plaintiff when Defendants did not provide Plaintiff an affordable permanent Loan Modification under HAMP.

146.    As stated herein, Plaintiff applied for a permanent Loan Modification on several occasions.   Plaintiff received a trial Modification and thereafter was offered a permanent Modification, one of which was very unaffordable.

147.    Since that time, Plaintiff has made additional attempts to apply for an affordable permanent Loan Modification with Defendants.   On each of these attempts, Plaintiff's efforts have been thwarted and unsuccessful because of Defendants' tactics and roadblocks to continually deny Plaintiff her legal rights, including claiming Plaintiff did not comply with Defendants' requests to provide documentation when in fact Plaintiff had and transferring Plaintiff to different departments in order to avoid Plaintiff's legitimate loan Modification requests.

148.    Defendants, and each of them, negligently and willfully breached their implied covenant of good faith and fair dealing when the COUNTRYWIDE representative stated that she had to be behind on her Mortgage payments before she would be able to qualify for any type of assistance.

149.    Relying on COUNTRYWIDE/BOFA's representations Plaintiff stopped paying her Mortgage payment in desperation to save her home.

150.    Defendants, and each of them, negligently and willfully breached their implied covenant of good faith and fair dealing when they offered a Loan Modification that required payments of more than 67% of her gross monthly income and when they informed Plaintiff that her permanent Loan Modification applications was denied in 2011, and failed to give an explanation or reason thereof.

151.    After receiving the first NOD in April 2009, Plaintiff offered to make a single payment worth three months of her unmodified mortgage payments.  However the customer service representative told Plaintiff that no partial payments would be accepted and that only full

payment of all past due amounts would be accepted (approximately $17,000.00).  Plaintiff was prevented from tendering a partial payment.

152.    Defendants' negligent and/or willful efforts to thwart Plaintiff's efforts to obtain a workout solution prevented Plaintiff from fulfilling her obligations under the contract.

153.    As a proximate result of Defendants' wrongful conduct, Plaintiff has been damaged in the amount of ongoing penalties, fees and interest charged by Defendants for Defendants' refusal to accept Plaintiff's Loan payments, Plaintiff's non-acceptance for a permanent Loan Modification, due to Defendants' negligent and/or willful attempts to thwart her efforts for a permanent Modification, which may result in the loss of her home.  Plaintiff will be further damaged in a like manner so long as Defendants' conduct continues, in an amount to be proven at trial.

154.    Defendants' actions in this matter have been, negligent, willful, knowing, malicious, fraudulent, and oppressive, entitling Plaintiff to punitive damages in an amount appropriate to punish Defendants and to deter others from engaging in the same behavior.

155.    Plaintiff is entitled to such relief as is set forth in this Cause of Action, including punitive damages, in excess of $100,000.00, and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

### EIGHTH CAUSE OF ACTION
### VIOLATION OF TILA, 15 U.S.C. §1601
### (Against all Defendants)

156.    Plaintiff hereby realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

157.    Defendants violated TILA by failing to provide Plaintiff with accurate material disclosures required under TILA and not taking into account the intent of the State Legislature in approving this statute which was to fully inform home buyers of the pros and cons of mortgages in a language (both written and spoken) that they can understand and comprehend; and advise them to compare similar loan products with other lenders.  It also requires the lender to offer

other loan products that might be more advantageous for the borrower under the same qualifying matrix.

158.    Prior to entering into the Loan, Defendants failed to inform Plaintiff that she was entering into a Loan that contained a higher interest rate and much longer loan term than originally represented to Plaintiff.

159.    Prior to entering into the Loan, Defendants failed to provide Plaintiff with any of the necessary disclosures as Loan documents were not provided to Plaintiff until after the Loan transaction was entered into, signed, recorded, and completed.

160.    Any and all statute[s] of limitations relating to disclosures and notices required pursuant to 15 U.S.C §1601, et seq. were tolled due to Defendants' failure to effectively provide the required disclosures and notices to Plaintiff.

161.    An actual controversy now exists as Plaintiff contends she has the right to rescind the Loan on the Subject Property alleged in this Complaint, and based on information and belief, Defendants deny that right.

162.    As a direct and proximate result of Defendants' violations, Plaintiff has incurred and continues to incur damages in an amount according to proof but not yet ascertained, including without limitation, statutory damages and all amounts paid or to be paid in connection with the transaction.

163.    Defendants were unjustly enriched at the expense of Plaintiff who is, therefore, entitled to equitable restitution and disgorgement of profits obtained by Defendants.

164.    Defendants' actions in this matter have been willful, knowing, malicious, fraudulent, and oppressive, entitling Plaintiff to punitive damages in an amount appropriate to punish Defendants and to deter others from engaging in the same behavior.

165.    Plaintiff is entitled to such relief as is set forth in this Cause of Action, including punitive damages and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

/ / /

**FIRST AMENDED COMPLAINT FOR ORIGINATION FRAUD AND WRONGFUL FORECLOSURE UNDER CC § 2923.5**

## NINTH CAUSE OF ACTION
### RESCISSION
#### (As to all Defendants)

166.    Plaintiff hereby realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

167.    The federal doctrine of fraudulent concealment operates to toll the statute of limitations where a Plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part.  *Holmberg v. Armbrecht* (1946) 327 U.S. 392, 397 (quoting *Bailey v. Glover* (1874) 21 Wall. 342, 348); see *Maggio v. Gerard Freezer & Ice Co.* (1987) 824 F. 2d 123, 127 (1st Cir).  Defendants failed to provide Plaintiff with Loan documents, disclosures, and notices until after the Loan transaction was completed.  Plaintiff did not discover Defendants' wrongdoing until Plaintiff began looking into her Loan documents within the last year.

168.    Plaintiff is entitled to rescind the Loan for all of the foregoing reasons: 1) TILA Violations; 2) Failure to provide proper disclosures; 3) Intentional Fraudulent Acts; 4) Fraudulent Concealment; and 5) Public Policy Grounds, each of which provides independent grounds for relief.

169.    The Truth in Lending Act. 15 U.S.C. §1601 et seq. extends Plaintiff's right to rescind a loan to three years from the date of closing if the borrower received false or incomplete disclosures of either the Loan terms or Borrower's right to rescind.  Here, Defendants failed to properly disclose the details of the Loan, including the Loan terms, that the principal balance would increase, and that the Loan payment would increase.  In addition, the initial disclosures were not provided to Plaintiff and there was a lack of diligence and collusion on the part of the broker, lender, and underwriter to place Plaintiff in a Loan that she could not afford and would ultimately benefit Defendants.

170.    Plaintiff is also entitled to rescind the Loan based upon Defendants' fraudulent concealment regarding the details of the Loan as set forth in detail in Plaintiff's first cause of action.

171.    The public interest would be prejudiced by permitting the alleged contract to stand; such action would regard an unscrupulous lender.

172.    As a proximate result of Defendants' actions, Plaintiff has been damaged in an amount not yet ascertained, to be proven at trial.

173.    Plaintiff is entitled to such relief as is set forth in this Cause of Action, in excess of $150,000.00 and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

**TENTH CAUSE OF ACTION**
**PREDATORY LENDING; CALIFORNIA BUSINESS**
**AND PROFESSIONS CODE §17200**
**(Against all Defendants)**

174.    Plaintiff hereby realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

175.    The Office of the Comptroller of the Currency defines Predatory Lending as any lien secured by real estate which shares well known common characteristics that result in Unfair and Deceptive Business Practices under *California Business and Professions Code* §17200.

176.    Acts undertaken by the Defendants here that are consistent with the Office of the Comptroller's definition include the fact that this loan was marketed in a way which fails to fully disclose all material terms and includes terms and provisions which are unfair, fraudulent, and unconscionable.

177.    Defendants uniformly failed to disclose and omitted material information that was known only to themselves and that could not reasonably have been discovered by Plaintiff as set forth in the preceding counts.

178.    By engaging in the above-described acts and practices Defendants have committed one or more acts of unfair competition within the meaning of *Business & Professions Code* §§ 17200, et seq.

179.    As a result of the Material Omissions and Defendants' other partially true statements and failures to disclose as alleged herein, Plaintiff has suffered injury and lost money and property.

180.    **Unlawful**: The unlawful acts and practices of Defendants alleged above constitute unlawful business acts and/or practices within the meaning of *California Business & Professions Code* §§ 17200, et seq.  Defendants' unlawful business acts and/or practices as alleged herein have violated numerous laws including state statutory and/or common law and said predicate acts are, therefore, per se violations of §17200, et seq.  These predicate unlawful business acts and/or practices include, but are not limited to, the following: *California Civil Code* §§ 1572 (Actual Fraud - Omissions), 1573 (Constructive Fraud by Omission), and 1710 (Deceit), 2923.5, 2923.6 and other statutory and common law in effect.

181.    In addition, under well-established California common law, Defendants' partial, conditional representations about the basis for loan qualification on "stated income" loans in which Plaintiff's income was underwritten on grossly inflated figures obligated Defendants to disclose the whole truth about that subject, namely, that these loans were, in fact, guaranteed to cause difficulty in repayment and default to occur. See, e.g., *LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 336. "Even where no duty to disclose would otherwise exist, 'where one does speak he must speak the whole truth to the end that he does not conceal any facts which materially qualify those stated ... [T]he telling of a half-truth calculated to deceive is fraud.'" *Vega v. Jones, Day, Reavis & Pogue* (2004) 121 Cal.App.4th 282, 292; *Randi W. v. Muroc Joint United School Dist.* (1997) 14 Cal.4th 1066, 1082 (in "a misleading half-truths' situation ... defendants, having undertaken to provide some information ... were obliged to disclose all of these facts which 'materially' qualify the limited facts disclosed.") and that "had the omitted information been disclosed, [Plaintiffs] would have been aware of it and behaved differently." *Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1093.

182.    As alleged herein, had Defendants disclosed the whole truth about the subject FRM loan, Plaintiff would not have entered into the Loan. Specifically:

(a)    Had Defendants disclosed that the Loan payment was based on the inflated income of Plaintiff by Defendants, Plaintiff would not have entered into the Loan.  Defendants

did not disclose this but instead concealed this fact and have made it impossible for Plaintiff to keep up her mortgage payments in the amount of $3,673.91 per month;

(b)     Had Defendants disclosed that the monthly payment of $3,673.91 was for a term of forty (40) years, rather than the thirty (30) years, as originally represented to Plaintiff, Plaintiff would not have entered into the Loan;

(c)     Had Defendants disclosed that the interest rate was 6.375%, rather than the 3 or 4% initially promised to Plaintiff, Plaintiff would not have entered into the Loan;

(d)     Had Defendants disclosed that the costs just to refinance Plaintiff's original loan with Defendants was going to cost her $48,332.39, Plaintiff would not have entered into the Loan.

183.     The harm to Plaintiff outweighs the utility, if any, of Defendants' acts and/or practices as alleged herein.  Thus, Defendants' deceptive and sharp business acts and/or practices, as alleged herein, were unfair within the meaning of *Bus. & Prof Code* 17200, et seq.  As alleged herein, Defendants' business acts and practices offend established public policies, including, public policies against making partial half-truths and failing to disclose important material facts to borrowers before they entered into the subject loans.  This practice is and was immoral, unethical, oppressive, unscrupulous or substantially injurious to the consumer and thus unfair within the meaning of *Bus. & Prof. Code* 17200, et seq.

184.     At all times relevant, Defendants' misconduct and omissions alleged herein caused: 1) substantial injury to Plaintiff, 2) had no countervailing benefit to consumers or to competition that could possibly outweigh this substantial injury; and 3) caused injury that could not have been avoided or even discovered by ordinary consumers, because it resulted from Defendants' failure to disclose and/or omission of material information that only the Defendants knew or could have known.  Thus, Defendants' acts and/or practices as alleged herein were unfair within the meaning of *Bus. & Prof. Code* 17200, et seq.

185.     **Fraudulent**: Defendants' acts and practices, as alleged herein, were likely to, and did deceive Plaintiff.  The Material Omissions, acts, practices, and non-disclosures, as alleged

herein, therefore, constitute fraudulent business acts and/or practices within the meaning of *California Business & Professions Code* §§ 17200, et seq. are, but are not limited to the following:

186.    This Loan was marketed in whole or in part on the basis of fraud, exaggeration, misrepresentation, and/or the concealment of a material fact and was underwritten without due diligence by the party originating the Loan.

187.    The Loan contains terms whereby Plaintiff can never realistically repay the Loan. Defendants' conduct and failure to disclose the whole truth about the Loan's interest rate, length of the term of the Loan and costs associated with the Loan was deceptive and unfair.  Defendants initiated this scheme in order to maximize the amount of the loans issued to consumers and to maximize Defendants' profits.

188.    At all times relevant, Defendants engaged in a pattern of deceptive conduct and concealment aimed at maximizing the number of borrowers who would accept these types of loans.   Defendants marketed and sold Plaintiff a deceptively devised financial product. Defendants marketed and sold their loan product to consumers, including Plaintiff, in a false and deceptive manner.  Defendants marketed and advertised to the general public through marketing material, a Loan that appeared to have a very low, fixed interest rate and monthly payments without true verification of income.

189.    Defendants aggressively sold their product as a fixed low interest home loan. Defendants knew that if marketed in such a manner it would be a hugely popular and profitable product.  While Defendants trumpeted its low, fixed rate loans to the public, Defendants knew, however, that many of the borrower's would not be able to afford the loans.

190.    Defendants lured Plaintiff into this Loan with promises that she could afford the monthly payment and did not tell her that they had inflated her income on the Loan Application in order to qualify her for the Loan.

**FIRST AMENDED COMPLAINT FOR ORIGINATION FRAUD AND WRONGFUL FORECLOSURE UNDER CC § 2923.5**

191.   During the Loan Application process, Defendants uniformly promoted, advertised, and informed Plaintiff that in accepting these Loan terms, Plaintiff would be able to afford the mortgage payment.

192.   This Loan is based on a Loan Application that based on fraudulent facts that have been concealed from Plaintiff.  Plaintiff never read the Loan Application.  As such, Plaintiff is informed and believes that in order for her to qualify for the Loan, her income and assets had to be grossly overstated.  The likelihood that these facts are true is that the information on the Loan application prepared by Defendants was never verified by Plaintiff. This Loan was underwritten without due diligence by the party originating the Loan.  Proper analysis was not done for determining the ability of the borrower to repay the Loan.

193.   Plaintiff did not discover the fraudulent facts used by Defendants until Plaintiff reviewed the original Loan documents within the past year.  It was only then that she discovered **why** the monthly payment had become unaffordable.  Plaintiff is informed and believes, and thereon alleges, that Defendants also continued to pursue the foreclosure process unlawfully without following proper procedures for nonjudicial foreclosure in violation of *Civ. Code* §§2923.5 and 2923.6, as set forth above.

194.   As a direct and proximate result of the aforementioned omissions, acts and/or practices, Defendants received monies and continue to hold the monies expended by Plaintiff who purchased the FRM Loan as alleged herein.

195.   The unlawful, unfair, deceptive, and/or fraudulent business acts and practices of Defendants, as fully described herein, present a continuing threat to Plaintiff and members of the public to be misled and/or deceived by Defendants' as alleged herein.  Plaintiff and other members of the general public have no other remedy of law that will prevent Defendants' misconduct as alleged herein from occurring and/or reoccurring in the future.

196.   As a direct and proximate result of Defendants' unlawful, unfair, and/or fraudulent conduct alleged herein, Plaintiff has lost thousands of dollars of equity in her home.  Plaintiff is a direct victim of the Defendants' unlawful, unfair, and fraudulent conduct, and Plaintiff has

suffered injury in fact, and has lost money or property as a result of Defendants' unfair competition.

197. Plaintiff justifiably relied on Defendant's deception, which was the actual and proximate cause of Plaintiff's damages, including but not limited to all interest and fees paid to Defendants as a result of their unfair, and/or fraudulent business acts and/or practices, in an amount to be proven at trial.

198. Plaintiff is entitled to injunctive relief, to such relief as is set forth in this Cause of Action, in excess of $150,000.00, and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

## ELEVENTH CAUSE OF ACTION
### UNFAIR AND DECEPTIVE BUSINESS ACT PRACTICES (UDAP)
### (Against all Defendants)

199. Plaintiff hereby realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

200. *California Civil Code* §1920(a): Plaintiff alleges that Defendants failed to undergo a diligent underwriting process when originating the terms of Loan because Defendants did not consider the appropriate factors to determine whether Plaintiff could meet the mortgage obligations of the Subject Loan, as was their duty pursuant to *Civil Code* §1920(a).

201. Pursuant to California *Civil Code* §1920(a), "[s]tandards for the adjustment of interest rates or monthly payments shall consider factors which can reasonably be deemed to affect the ability of borrowers to meet their mortgage obligations."

202. Defendants only asked Plaintiff for verification of her income. Plaintiff informed Defendants her income was only $4,703.00 per month and provided verification of her income. Defendants did not ask Plaintiff what her monthly expenses were nor was she asked to provide Tax Returns or W2's.

203. Nevertheless, Defendants concealed from Plaintiff the amount of income they inserted into the Loan Application used in qualifying Plaintiff for this Loan. Plaintiff was never given a copy of the Application.

204.    As a result, Defendants failed to reasonably consider whether or not Plaintiff would be able to meet her mortgage obligation as required by *Civil Code* §1920(a).  This violation makes the Loan origination wrongful, improper, and illegal under California law.

205.    Defendants' failure to comply with *Civil Code* §1920(a) greatly prejudiced Plaintiff's rights by preventing Plaintiff from receiving a mortgage obligation she could meet.

206.    In November 2008, Plaintiff had started calling COUNTRYWIDE for any options and/or assistance and direction as to lowering her payment. COUNTRYWIDE explained that Plaintiff was ineligible for loan modification assistance because she was current on her Mortgage Loan.  COUNTRYWIDE stated that she had to be behind on her Mortgage payments before she would be able to qualify for any type of assistance.  Plaintiff had never been late on her Mortgage payment since she had purchased her home.  Plaintiff decided to follow the advice of the COUNTRYWIDE representative and stopped paying her Mortgage payment in desperation to save her home.

207.    Plaintiff hired 3 different Modification companies assist her in the Loan Modification process.  She kept in communication with the Agencies that she hired to ensure success in the Loan Modification process.  Plaintiff was not going to give up.  Plaintiff provided all documentation to BOFA through the representatives she had hired and complied with all demands.

208.    After receiving the first NOD in April 2009, Plaintiff offered to make a single payment worth three months of her unmodified mortgage payments.  However the customer service representative told Plaintiff that no partial payments would be accepted and that full payment of all past due amounts would be accepted (approximately $17,000.00).  Plaintiff was therefore unable to tender a partial payment.

209.    After months of attempts, BOFA finally offered Plaintiff a three month Trial Modification (HAMP) and she made monthly payments for 6 months in the amount of $2,153.30 from August 2009 to January 2010.  Plaintiff continued to contact BOFA as to the progress of her permanent Loan Modification.  Plaintiff then received the Permanent Modification Offer, which was an adjustable payment schedule, which ended up being $2,015.59 per month for the

first five years.  Additionally, Plaintiff was responsible for the unmodified second loan payment of approximately $700.00 per month.  Plaintiff could not afford the payments at all because her monthly income at the time was less than $4000.00 per month and the payments required amounted to over $2,700.00 per month.

210.   Defendants knew at Plaintiff's age and income that such a payment was unaffordable and that offering Plaintiff such a permanent loan modification was unconscionable and self-serving, only forcing Plaintiff further into foreclosure and accumulating more fees, interest and penalties on behalf of Defendants.

211.   Plaintiff was offered a second three month Loan Modification Trial Plan in 2011. The BOFA representative, Cynthia Figueroa (phone: (800) 405-0078 promised Plaintiff that if she successfully completed the Trial Plan, BOFA would then offer her a reasonable modification.   In reliance on BOFA's representations, Plaintiff timely made all three trial payments of $2293.37, but no permanent Loan Modification was offered at the end of the trial payment period.

212.   As a result of these wrongful acts and omissions, Plaintiff has lost equity in the Subject Property, the Subject Property has been encumbered, and foreclosure is now pending.

213.   Defendants' violations of *Civil Code* §2923.5(a) in not contacting Plaintiff prior to the filing of the Notice of Default to discuss a Loan Modification in accordance with section 2923.5; (b) not sending Plaintiff a certified letter with return receipt requested after Plaintiff had not responded to Defendants after two weeks (Plaintiff has no recollection of that ever happening);  and  (c) refusing  to enter  into good faith discussions with Plaintiff in compliance with §2923, are all Unfair and Deceptive business practices.

214.   In addition, Plaintiff has applied for permanent Modifications on multiple occasions.  Defendants continue to engage in unfair business practices by willfully ignoring and intentionally thwarting all of Plaintiff's attempts to be approved for an affordable Loan Modification program.

215.   On Plaintiff's attempts to get a Loan Modification, her efforts have been thwarted and unsuccessful because of Defendants' tactics and roadblocks to continually deny Plaintiff her

legal rights, including claiming Plaintiff did not comply with Defendants' requests and transferring Plaintiff to different departments in order to avoid Plaintiff's legitimate Loan Modification requests and then denying Plaintiff's request without any explanation for such denial.

216.    By reason of Defendants' fraudulent, deceptive, unfair and other wrongful conduct as herein alleged, said Defendants have engaged in Unfair and Deceptive business practices designed to deprive Plaintiff of her home and equity, as well as her past and future investment.

217.    By reason of the foregoing, Plaintiff has suffered and continues to suffer damages including, but not limited to, interest and late fees, in a sum that is, as of yet unascertained, to be proven at trial.

218.    Plaintiff is entitled to such relief as is set forth in this Cause of Action, in excess of $150,000.00, and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

## TWELFTH CAUSE OF ACTION
## INTENTIONAL MISREPRESENTATION
### (Against all Defendants)

219.    Plaintiff realleges and hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

220.    Defendants, in or around November 2008 and continuing for the next three years, made promises about material facts without any intention of performing them.  Namely, the Defendants were willing to negotiate with Plaintiff to refinance her property or provide a loan modification.  After accepting Plaintiff's initial request for a Loan Modification, BOFA's representatives stated "the Loan Modification looks good."  However, after receiving all necessary paperwork, BOFA offered a permanent loan modification that required Plaintiff to make monthly payments in excess of 67% of her monthly income which they knew that Plaintiff could not afford.

221.   Any and all statute[s] of limitations relating to disclosures and notices required pursuant to 15 U.S.C §1601, et. seq. were tolled due to Defendants' failure to effectively provide the required disclosures and notices to Plaintiffs, and Plaintiffs' inability to discover Defendants' violations until brought to their attention in the Litigation process, within the last year.

222.   The Loan Application overstated Plaintiff's income at $112,500 annually when her actual income was only $56,445.00 annually.

223.   Defendants made promises about material facts knowing that they were false. Namely, Defendants qualified Plaintiffs for an unconscionable loan by falsely stating Plaintiff's income.

224.   In November 2008, Plaintiff had started calling COUNTRYWIDE for any options and/or assistance and direction as to lowering her payment. COUNTRYWIDE explained that Plaintiff was ineligible for loan modification assistance because she was current on her Mortgage Loan. COUNTRYWIDE stated that she had to be behind on her Mortgage payments before she would be able to qualify for any type of assistance.

225.   Relying on COUNTRYWIDE's representations, Plaintiff stopped paying her Mortgage payment in desperation to save her home.

226.   Plaintiff hired 3 different Modification companies assist her in the Loan Modification process.  She kept in communication with the Agencies that she hired to ensure success in the Loan Modification process.  Plaintiff was not going to give up.  Plaintiff provided all documentation to BOFA through the representatives she had hired and complied with all demands.

227.   After receiving the first NOD in April 2009, Plaintiff offered to make a single payment worth three months of her unmodified mortgage payments.  However the customer service representative told Plaintiff that no partial payments would be accepted and that only full payment of all past due amounts would be accepted (approximately $17,000.00).  Plaintiff was, therefore, unable to tender a partial payment.

228.   After months of attempts, BOFA finally offered Plaintiff a three month Trial Modification (HAMP) and she made monthly payments for 6 months in the amount of $2,153.30

from August 2009 to January 2010. Plaintiff continued to contact BOFA as to the progress of her permanent Loan Modification. Plaintiff then received the Permanent Modification Offer, which was an adjustable payment schedule, which ended up being $2,015.59 per month for the first five years. Additionally, Plaintiff was responsible for the unmodified second loan payment of approximately $700.00 per month. Plaintiff could not afford the payments at all because her monthly income at the time was less than $4000.00 per month and the payments required amounted to over $2,700.00 per month.

229.    Defendants knew at Plaintiff's age and income that such a payment was unaffordable and that offering Plaintiff such a permanent loan modification was unconscionable and self-serving, only forcing Plaintiff further into foreclosure and accumulating more fees, interest and penalties on behalf of Defendants.

230.    Plaintiff was offered a second three month Loan Modification Trial Plan in 2011. The BOFA representative, Cynthia Figueroa (phone: (800) 405-0078) promised Plaintiff that if she successfully completed the Trial Plan, BOFA would then offer her a reasonable modification.

231.    In reliance upon BOFA's representations, Plaintiff timely made all three trial payments of $2293.37, but no permanent Loan Modification was offered at the end of the trial payment period.

232.    Defendants' promises were made with intent to defraud and induce Plaintiff to rely upon them and to act as described herein. At the time Plaintiffs acted, they were unaware of Defendants' intention to induce them into obtaining an unconscionable and unaffordable loan. Plaintiffs acted in justifiable reliance upon the intentionally fraudulent statement of income in agreeing to the loan terms.

233.    As a result of Plaintiffs reliance upon Defendants' conduct, Plaintiffs have been damaged as described above.

234.    Defendants, and each of them, in doing these acts, did so with malice, oppression, and fraud, and Plaintiffs are therefore, entitled to punitive damages in an amount deemed fair and just according to proof.

## THIRTEENTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION
### (Against all Defendants)

235.   Plaintiff realleges and hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

236.   Although some of the Defendants may have reasonably believed some or all of the representations they made described in this Complaint were true, none of them had reasonable grounds for believing such representations to be true at the time:   (a) the representations were instructed to be made, as to those Defendants instructing others to make representations, or (b) at the time the representations were made, as to those Defendants making representations and those Defendants instructing others to make the representations, or (c) at the time the representations were otherwise ratified by the other Defendants.

237.   Such representations, fully set forth in this Complaint, were not true.   Defendants intended that Plaintiff rely upon those misrepresentations.   As described herein, Plaintiff reasonably relied on those representations.   By reason of Defendants' prominence and campaign of deception as to its business plans and the relationship of trust developed between each of the Defendants and Plaintiff, Plaintiff was justified in relying upon Defendants' representations.   As a result of relying upon the foregoing misrepresentations, Plaintiff entered into a mortgage contract with Defendants.   As a result of Defendants' scheme described herein, Plaintiff could not afford their mortgage.   Further, as a result of the Defendants' scheme, Plaintiff could not refinance (as promised by Agent) or sell her residence without suffering a loss of equity.

238.   Any and all statute[s] of limitations relating to disclosures and notices required pursuant to 15 U.S.C. §1601, et seq. were tolled due to Defendants' failure to effectively provide the required disclosures and notices to Plaintiff, and Plaintiff's inability to discover Defendants' violations until brought to their attention in the Loan modification process, within the last year. During the Litigation process, Plaintiff first realized that the Application falsely stated they her income was $112,500 annually when in fact it was only $56,445.00 per month.

239.    Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages as a result of the foregoing include loss of equity in her house, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

240.    Plaintiff is entitled to such relief as is set forth in this Cause of Action and in the Prayer below.

### FOURTEENTH CAUSE OF ACTION
### QUIET TITLE
### (Against All Defendants)

241.    Plaintiff hereby realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

242.    Plaintiff is the legal owner of the property that is commonly known as 31 Lincoln Street, Watsonville, California  95076 pursuant to Deed of Trust recorded August 31, 2006 as document number 2006-0051045.

243.    Plaintiff seeks to quiet title against the claims of BOFA, and anyone else claiming interest in the property.  BOFA and any successors or assignees have no right to title or interest in the property and no right to entertain any rights of ownership including rights of possession.

244.    Plaintiff seeks to quiet title as of April 16, 2009.  Plaintiff seeks a judicial declaration that the title to the Subject Property is vested in Plaintiff alone and that Defendants and each of them be declared to have no interest estate, right, title or interest in the Subject Property and that Defendants, their agents and assigns, be forever enjoined from asserting any estate, right title or interest in the Subject Property.

245.    Defendants' claims are without any right and Defendants have no title, estate, lien, or interest in the Subject Property in that purported power of sale contained in the Deed of Trust is of no force and effect because Defendants' failure to comply with the provisions set forth in California law. Plaintiff desires and is entitled to a judicial declaration quieting title in the name of Plaintiff with regards to this pending foreclosure and unlawful transfer of title.

**FIRST AMENDED COMPLAINT FOR ORIGINATION FRAUD AND WRONGFUL FORECLOSURE UNDER CC § 2923.5**

246.    As Defendants do not have any legal ownership or interest in the Subject Property on the date of foreclosure, allegedly obtained the Subject Property through fraud and wrongful conduct, and failed to adhere to the strict statutory requirements to effectuate a foreclosure sale of the Subject Property, the foreclosure sale proceedings are void and invalid.  Therefore, the Subject Property is still Plaintiff's property.

247.    Accordingly, the Court should rule that the Subject Property remains Plaintiff's property and award consequential damages as proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants and each of them as follows:

1. To enjoin the trustee sale of Plaintiff's Subject Property or any subsequent continued date;

2. For compensatory damages awarded according to proof, in excess of $150,000.00;

3. For exemplary and punitive damages according to proof;

4. For reasonable attorneys' fees and costs of suit;

5. For an order restraining Defendants from engaging in any further unfair business practices of the type to be proven at the time of trial;

6. For a preliminary and permanent injunction staying the foreclosure proceeding pending the outcome of this case;

7. For damages provided by statute; and

8. For such other and further relief as the court deems just and proper.


Dated: July 5, 2012                              CONSUMER LITIGATION LAW CENTER, APC


                                        By: _/s/ SEPTEMBER J. KATJE_____
                                            SEPTEMBER J. KATJE,
                                            Attorney for Plaintiff,
                                            SHARON BROTHERS

**FIRST AMENDED COMPLAINT FOR ORIGINATION FRAUD AND WRONGFUL FORECLOSURE UNDER CC § 2923.5**

# EXHIBIT A

**2006-0051045**

| Recorded | | REC FEE | 57.00 |
|---|---|---|---|
| Official Records | | | |
| County of | | PENALTY FEE | 51.00 |
| Santa Cruz | | | |
| GARY E. HAZELTON | | | |
| Recorder | | | |
| | | LTS | |
| 08:00AM 31-Aug-2006 | | Page 1 of 17 | |

RECORDED AT THE REQUEST OF
FIRST AMERICAN TITLE COMPANY

Recording Requested By:
M. HACKNEY

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.

MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

Prepared By:
ASHLEY WHITESIDE

---
[Space Above This Line For Recording Data]
---

2701- 2482813                    00014298913408006
[Escrow/Closing #]                    [Doc ID #]

## DEED OF TRUST

MIN 1000157-0007157777-5

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated AUGUST 26, 2006       , together with all Riders to this document.

(B) "Borrower" is
SHARON BROTHERS, AN UNMARRIED WOMAN

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
                                Page 1 of 16
VMP -6A(CA) (0207)   CHL (08/05)(d)   VMP Mortgage Solutions, Inc. (800)521-7291       Form 3005 1/01
CONV/VA





DOC ID #: 0001429891340B006

Borrower's address is
31 Lincoln St, Watsonville, CA 95076-5028
Borrower is the trustor under this Security Instrument.
(C) "Lender" is
COUNTRYWIDE HOME LOANS, INC.
Lender is a CORPORATION
organized and existing under the laws of NEW YORK
Lender's address is
4500 Park Granada MSN# SVB-314, Calabasas, CA 91302-1613
(D) "Trustee" is
ReconTrust Company, N.A
225 West Hillcrest Dr., MSN TO-02, Thousand Oaks, CA 91360
(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated AUGUST 26, 2006 . The Note states that Borrower owes Lender
FIVE HUNDRED SIXTY THOUSAND and 00/100

Dollars (U.S. $ 560,000.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than SEPTEMBER 01, 2046 .
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider ☐ Condominium Rider ☐ Second Home Rider
☐ Balloon Rider ☐ Planned Unit Development Rider ☐ 1-4 Family Rider
☐ VA Rider ☐ Biweekly Payment Rider ☐ Other(s) [specify]

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii)

VMP® -6A(CA) (0207)     CHL (08/05)     Page 2 of 16     Form 3005  1/01

DOC ID #: 0001429891340 8006

conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
           COUNTY                    of               SANTA CRUZ            :
        [Type of Recording Jurisdiction]                   [Name of Recording Jurisdiction]
SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number: 025011025                            which currently has the address of
                    31 Lincoln St, Watsonville
                                    [Street/City]
California 95076-5028 ("Property Address"):
                 [Zip Code]

   TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including,

VMP ®-6A(CA) (0207)        CHL (08/05)          Page 3 of 16                    Form 3005  1/01

DOC ID #: 0001429813408006

but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

DOC ID #: 00014298913408006

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

DOC ID #: 0001429891340800b

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of

DOC ID #: 00014298913408006

paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

DOC ID #: 00014298913408006

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower

DOC ID #: 0001429891340800G

shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security

DOC ID #: 00014298913408006

Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

-6A(CA) (0207)          CHL (08/05)          Page 10 of 16          Form 3005 1/01

DOC ID #: 00014298913408006

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

-6A(CA) (0207)          CHL (08/05)                Page 11 of 16                              Form 3005  1/01

DOC ID #: 0001429891340800G

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in



DOC ID #: 00014298913408006

compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

DOC ID #: 00014298913408006

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

-6A(CA) (0207)          CHL (08/05)          Page 14 of 16          Form 3005  1/01



DOC ID #: 00014298913408006

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
SHARON BROTHERS                                        -Borrower

_____ (Seal)
                                                      -Borrower

_____ (Seal)
                                                      -Borrower

_____ (Seal)
                                                      -Borrower

DOC ID #: 00014298913408006

State of California
County of _SANTA CRUZ_ } ss.

On _AUGUST 27, 2006_ before me, _BROOKE SQUYRES,_
_NOTARY PUBLIC_ personally appeared

_SHARON BROTHERS_

~~personally known to me~~
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Brooke Squyres_ (Seal)



BROOKE SQUYRES
COMM. #1505536
Notary Public – California
Santa Cruz County
My Comm. Expires Aug. 3, 2008

-6A(CA) (0207)     CHL (08/05)     Page 16 of 16     Form 3005  1/01

LEGAL DESCRIPTION

THE LAND REFERRED TO IN THIS REPORT IS SITUATED IN THE STATE OF California, COUNTY OF SANTA CRUZ CITY OF WATSONVILLE, AND DESCRIBED AS FOLLOWS:

A PART OF THE LANDS DESCRIBED IN THE DEED FROM JAMES A. WHITE TO GEORGE V. FOSTER, RECORDED APRIL 6, 1927 IN VOLUME 80 OF OFFICIAL RECORDS, AT PAGE 112; AND BEGINNING AT A 10 INCH SPIKE DRIVEN ON THE PRODUCED CENTERLINE OF LINCOLN STREET WHICH POINT OF BEGINNING IS NORTH 42? 18' 15" WEST 125.71 FEET FROM THE NORTHERN CORNER OF THE LANDS CONVEYED BY GOERGE V. FOSTER AND LOUISE FOSTER TO THE CITY OF WATSONVILLE BY DEED RECORDED JANUARY 18, 1939 IN VOLUME 363 OF OFFICIAL RECORDS AT PAGE 348, SANTA CRUZ COUNTY RECORDS, AND IS ALSO THE MOST NORTHERLY CORNER OF THE LANDS CONVEYED BY GOERGE V. FOSTER, ET UX, TO FRANK INGRAM, ET UX, BY DEED RECORDED MARCH 19, 1948 IN VOLUME 633 OF OFFICIAL RECORDS, AT PAGE 117, SANTA CRUZ COUNTY RECORDS; RUNNING THENCE SOUTH 42? 18' 15" EAST 58.21 FEET TO THE MOST NORTHERLY CORNER OF A 17.50 FOOT STRIP OF LAND CONVEYED BY FRANK INGRAM, ET UX, TO ANTON ALAGA, ET AL, BY DEED RECORDED MAY 6, 1958 IN VOLUME 1183 OF OFFICIAL RECORDS, AT PAGE 367, SANTA CRUZ COUNTY RECORDS; THENCE ALONG THE NORTHWESTERLY LINE OF SAID 17.50 FOOT STRIP SOUTH 47? 45' 45" WEST 129.00 FEET, THENCE NORTH 42? 18' 15" WEST 58.21 FEET TO A 2 X 2 STAKE AT THE MOST SOUTHERLY CORNER OF LANDS NOW OR FORMERLY OF MATSUOKA AND THENCE ALONG THE SOUTHEASTERLY LINE OF SAID LAST MENTIONED LANDS NORTH 48? 05' 45" EAST 129.00 FEET TO THE POINT OF BEGINNING.

**ASSESSOR'S
PARCEL          017-273-20
NUMBER:**

Prepared by: ASHLEY WHITESIDE

LOAN #: 142989134

# NOTE

AUGUST 26, 2006
[Date]

WATSONVILLE
[City]

CALIFORNIA
[State]

31 Lincoln St, Watsonville, CA 95076-5028
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 560,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is
COUNTRYWIDE HOME LOANS, INC.
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    6.375 %.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the  FIRST    day of each month beginning on
OCTOBER 01, 2006   . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  SEPTEMBER 01, 2046  , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 10219, Van Nuys, CA 91410-0219
or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 3,228.82

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of  FIFTEEN     calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

Initials: _____

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Page 1 of 2



-SN (0207).01    CHL (010/04)(d)

VMP Mortgage Solutions, Inc. (800)521-7291

Form 3200 1/01



* 1 4 2 9 8 9 1 3 4 0 0 0 0 0 2 0 0 5 N *

* 2 3 9 9 1 *

LOAN #: 142989134

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)     _____ (Seal)
SHARON BROTHERS              -Borrower                              -Borrower

_____ (Seal)     _____ (Seal)
                             -Borrower                              -Borrower

*[Sign Original Only]*

Prepared by: ASHLEY WHITESIDE

# TRUTH IN LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER: COUNTRYWIDE HOME LOANS, INC.

    4500 Park Granada
    Calabasas, CA 91302-1613

[ ] Preliminary  [X] Final

DATE 08/26/2006

BORROWERS: SHARON BROTHERS

LOAN CASE NO. 142989134

Type of Loan  CONV UNINSURED NC Fixed EC

ADDRESS    31 Lincoln St
CITY STATE / ZIP  Watsonville, CA 95076-5028
PROPERTY    31 Lincoln St
    Watsonville, CA 95076-5028

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 6.765 % | $ 1,015,640.51 | $ 534,191.19 | $ 1,649,831.70 |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE |
|---|---|---|
| 479 | 3,228.82 | MONTHLY BEGINNING 10/01/2006 |
| 1 | 3,226.92 | LAST PAYMENT DUE 09/01/2046 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

DEMAND FEATURE: [X] This loan does not have a Demand Feature. [ ] This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE:
[ ] This loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY: You are giving a security interest in the property located at:
31 Lincoln St, Watsonville, CA 95076-5028

ASSUMPTION: Someone buying this property [X] cannot assume the remaining balance due under original mortgage terms
[ ] may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

PROPERTY INSURANCE: Hazard insurance, including flood insurance if the property is in a Special Flood Hazard Area, is required as a condition of this loan. You may obtain the insurance coverage from any insurance company acceptable to the lender. Complete details concerning insurance requirements will be provided prior to loan closing.

LATE CHARGES: If your payment is more than 15 days late, you will be charged a late charge of 5.000% of the overdue payment.

PREPAYMENT: If you pay off your loan early, you
[ ] may [X] will not be entitled to a refund of part of the finance charge.
[ ] may [X] will not have to pay a penalty.

See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

| BORROWER SHARON BROTHERS | DATE | BORROWER | DATE |
|---|---|---|---|
| BORROWER | DATE | BORROWER | DATE |

FHA/VA/CONV
● Truth In Lending Disclosure
2C296-US (08/06)(d)

Page 1 of 2



## DEFINITION OF TRUTH-IN-LENDING TERMS

### ANNUAL PERCENTAGE RATE

This is not the Note rate for which the borrower applied. The Annual Percentage Rate (APR) is the cost of the loan in percentage terms taking into account various loan charges of which interest is only one such charge. Other charges which are used in calculation of the Annual Percentage Rate are Private Mortgage Insurance or FHA Mortgage Insurance Premium (when applicable) and Prepaid Finance Charges (loan discount, origination fees, prepaid interest and other credit costs). The APR is calculated by spreading these charges over the life of the loan which results in a rate higher than the interest rate shown on your Mortgage/Deed of Trust Note. If interest was the only Finance Charge, then the interest rate and the Annual Percentage Rate would be the same.

### PREPAID FINANCE CHARGES

Prepaid Finance Charges are certain charges made in connection with the loan and which must be paid upon the close of the loan. These charges are defined by the Federal Reserve Board in Regulation Z and the charges must be paid by the borrower only, and not the seller if applicable. Non-inclusive examples of such charges are: Loan origination fee, "Points" or Discount, Private Mortgage Insurance or FHA Mortgage Insurance, Tax Service Fee. Some loan charges are specifically excluded from the Prepaid Finance Charge such as appraisal fees and credit report fees.

Prepaid Finance Charges are totaled and then subtracted from the Loan Amount (the face amount of the Deed of Trust/Mortgage Note). The net figure is the Amount Financed as explained below.

### FINANCE CHARGE

The amount of interest, prepaid finance charge and certain insurance premiums (if any) which the borrower will be expected to pay over the life of the loan.

### AMOUNT FINANCED

The Amount Financed is the loan amount applied for less the prepaid finance charges. Prepaid finance charges can be found on the Good Faith Estimate. For example if the borrower's note is for $100,000 and the Prepaid Finance Charges total $5,000, the Amount Financed would be $95,000. The Amount Financed is the figure on which the Annual Percentage Rate is based.

### TOTAL OF PAYMENTS

This figure represents the total of all payments made toward principal, interest and mortgage insurance (if applicable).

### PAYMENT SCHEDULE

The dollar figures in the Payment Schedule represent principal, interest, plus Private Mortgage Insurance (if applicable). These figures will not reflect taxes and insurance escrows or any temporary buydown payments contributed by the seller.

Prepared by: ASHLEY WHITESIDE

**COUNTRYWIDE HOME LOANS, INC.**

DATE:           08/26/2006
BORROWER:  SHARON BROTHERS
CASE #:
LOAN #:        142989134
PROPERTY ADDRESS: 31 Lincoln St
                 Watsonville, CA 95076-5028

Branch #: 0000844
2375 N GLENVILLE DR RGV-B844-Z
RICHARDSON, TX 75082
Phone: (888)973-8299
BT FAX No.: (972)781-3683

## ITEMIZATION OF AMOUNT FINANCED

| | | |
|---|---|---:|
| 1. | Loan Amount | 560,000.00 |
| 2. | Prepaid Finance Charges: | |
| | Origination Fee | 0.00 |
| | Discount Points | 24,500.00 |
| | Tax Service Fee | 60.00 |
| | Processing (Underwriting) | 675.00 |
| | Prepaid Interest ( 1 days) | |
| | of % per annum | 97.81 |
| | Mortgage Insurance Premium | 0.00 |
| | Mortgage Insurance Impounds | 0.00 |
| | Warehouse Fee | 0.00 |
| | VA Funding Fee | 0.00 |
| | FHA UFMIP | 0.00 |
| | Buydown | 0.00 |
| | Settlement Agent/Escrow | 250.00 |
| | Closing/Escrow | 200.00 |
| | Flood Check Fee | 26.00 |
| | **TOTAL** | 25,808.81 |
| 3. | Amount Financed (1 minus 2) | 534,191.19 |

I/We hereby acknowledge reading and receiving a completed copy of this disclosure.

| | | | |
|---|---|---|---|
| Borrower | Date | Borrower | Date |
| SHARON BROTHERS | | | |
| Borrower | Date | Borrower | Date |

FHA/VA/CONV
Itemization of Amount Financed - Reg Z
2C120US (03/04)(d)





**EXHIBIT B**



**DATA AS OF:** 08/08/2006

## EMPLOYMENT/SALARY VERIFICATION

| | | |
|---|---|---|
| 1. | **Employer:** | SBC California |
| 2. | **Employee:** | SHARON E BROTHERS |
| 3. | **Job Title:** | Service Representative (B |
| 4. | **Work Address:** | 3475B N 1ST ST, 300, SAN JOSE, California |
| 5. | **Date of Employment:** | 09/16/1974 |
| 6. | **Rate of Pay:** | $56,446.00 ANNUALLY |

**Is Employee Part-Time?**  NO __X__  YES _____
For part-time employees, pay is based on actual hours worked. Please see employee's paycheck stubs for hours and year to date earnings.

7. **Remarks:**

- For year to date earnings, please see employee's last paycheck stub.

- Any overtime is included within the gross amount field on the employee's paycheck stub.

- Employees may be eligible to receive a Company Team Award and/or individual award. To determine the amount of the employee's awards, please see the Miscellaneous Payment Information section of the employee's paycheck stubs.

- Management employees may be eligible to receive stock options. Additional amounts in year to date earnings and tax withholdings for managers my be attributable to income form the exercise of stock options.

- Some employees receive a telephone service concession which may be included on the employee's paycheck stub and in year to date earnings.

- For past year earnings, please see employee's previous year's W2 form.

- Company policy prohibits verification of the continuation of EMPLOYMENT OR OVERTIME.

This document was electronically generated based on a request from the employee and faxed
On Tuesday, August 08, 2006        at     4:58:22      to   (408)434-0862      . If another employment verification form
is required in the future, please contact the employee directly.

The information contained in this facsimile message is confidential and is intended only for use by the individual named above or a designated agent. If the reader of this message is not the intended recipient, you are hereby notified that any copy, dissemination or distribution of confidential, proprietary or privileged information is strictly prohibited. Please call (314)340-0139 to arrange for return of the facsimile.

Form: eLink_IVR_EVNORM_V2

# EXHIBIT C

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower," as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when □ the income or assets of a person other than the Borrower (including the Borrower's spouse) will be used as a basis for loan qualification or □the income or assets of the Borrower's spouse or other person who has community property rights pursuant to state law will not be used as a basis for loan qualification, but his or her liabilities must be considered because the spouse or other person has community property rights pursuant to applicable law and Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

If this is □ application for joint credit, Borrower and Co-Borrower each agree that we intend to apply for joint credit (sign below):

Borrower _____

Co-Borrower _____

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | VA | X Conventional | Other (explain): | Agency Case Number | Lender Case Number |
|---|---|---|---|---|---|
| | FHA | USDA/Rural Housing Service | | | 142989134 |

| Amount | Interest Rate | No. of Months | Amortization Type: | X Fixed Rate | Other (explain): |
|---|---|---|---|---|---|
| $560,000.00 | 6.375 % | 480 | | GPM | ARM (type): NC Fixed EC |

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| | No. of Units |
|---|---|
| Subject Property Address (street, city, state, & ZIP) | 1 |
| 31 Lincoln St. Watsonville, CA 95076-5028 | |

| Legal Description of Subject Property (attach description if necessary) | Year Built |
|---|---|
| SEE PRELIM | 1975 |

| Purpose of Loan | Purchase | Construction | Other (explain): | Property will be: |
|---|---|---|---|---|
| X Refinance | Construction-Permanent | | X Primary Residence / Secondary Residence / Investment |

Complete this line if construction or construction-permanent loan.

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a + b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

Complete this line if this is a refinance loan.

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance RATE REDUCTION | Describe Improvements ☐ made ☐ to be made |
|---|---|---|---|---|
| 1976 | $150,000.00 | $548,716.71 | | Cost $ 0.00 |

| Manner in which Title will be held | Estate will be held in: |
|---|---|
| AN UNMARRIED WOMAN | X Fee Simple |
| Title will be held in what Name(s) SHARON BROTHERS | Leasehold (show expiration date) |

Source of Down Payment, Settlement Charges, and/or Subordinate Financing (explain)
PROCEED FROM FINANCE

## III. BORROWER INFORMATION

| | Borrower | Co-Borrower |
|---|---|---|
| Borrower's Name (include Jr. or Sr. if applicable) | SHARON BROTHERS | Co-Borrower's Name (include Jr. or Sr. if applicable) |
| Social Security Number | 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 | Social Security Number |
| Home Phone (incl. area code) | (831)722-0712 | Home Phone (incl. area code) |
| DOB (mm/dd/yyyy) | 11/10/1950 | DOB (mm/dd/yyyy) |
| Yrs. School | | Yrs. School |

| Married | X Unmarried (include single, divorced, widowed) | Separated | Married | Unmarried (include single, divorced, widowed) | Separated |
|---|---|---|---|---|---|
| Dependents (not listed by Co-Borrower) no. 0 ages | | | Dependents (not listed by Borrower) no. ages | | |

| Present Address (street, city, state, ZIP) X Own ☐ Rent 30/00 No. Yrs. | Present Address (street, city, state, ZIP) ☐ Own ☐ Rent _____ No. Yrs. |
|---|---|
| 31 Lincoln St Watsonville, CA 95076-5028 | |

| Mailing Address, if different from Present Address | Mailing Address, if different from Present Address |
|---|---|

If residing at present address for less than two years, complete the following:

| Former Address (street, city, state, ZIP) ☐ Own ☐ Rent _____ No. Yrs. | Former Address (street, city, state, ZIP) ☐ Own ☐ Rent _____ No. Yrs. |
|---|---|

## IV. EMPLOYMENT INFORMATION

| | Borrower | | Co-Borrower |
|---|---|---|---|
| Name & Address of Employer | ☐ Self Employed | Yrs. on this job 30Yrs 08Mos | Name & Address of Employer | ☐ Self Employed | Yrs. on this job |
| SBC | | Yrs. employed in this line of work/profession 30 | | Yrs. employed in this line of work/profession |
| 3474 B N FIRST STREET WATSONVILLE, CA 95076 | | | | |

| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|
| SERVICE REP | | | |

If employed in current position for less than two years or if currently employed in more than one position, complete the following:

| Name & Address of Employer | ☐ Self Employed | Dates (from - to) | Name & Address of Employer | ☐ Self Employed | Dates (from - to) |
|---|---|---|---|---|---|
| | | Monthly Income $ | | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

| Name & Address of Employer | ☐ Self Employed | Dates (from - to) | Name & Address of Employer | ☐ Self Employed | Dates (from - to) |
|---|---|---|---|---|---|
| | | Monthly Income $ | | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

Freddie Mac Form 65 7/05
Fannie Mae Form 1003 7/05
Page 1 of 4



VMP-21N (0507)   CHL (09/05)(d)

VMP Mortgage Solutions, Inc. (800)521-7291
Application 1 of 1

*23991*

*14298913400000202 1 N*

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 9500.00 | $ 0.00 | $ 9500.00 | Rent | $ 0.00 | |
| Overtime | 0.00 | 0.00 | 0.00 | First Mortgage (P&I) | 3258.00 | $ 3,228.82 |
| Bonuses | 0.00 | 0.00 | 0.00 | Other Financing (P&I) | 0.00 | 288.75 |
| Commissions | 0.00 | 0.00 | 0.00 | Hazard Insurance | 128.18 | 0.00 |
| Dividends/Interest | 0.00 | 0.00 | 0.00 | Real Estate Taxes | 46.99 | 156.34 |
| Net Rental Income | 0.00 | 0.00 | 0.00 | Mortgage Insurance | 0.00 | 0.00 |
| Other (before completing, see the notice in "describe other income," below) | 0.00 | 0.00 | 0.00 | Homeowner Assn. Dues | 0.00 | 0.00 |
| | | | | Other: | 0.00 | 0.00 |
| Total | $ 9500.00 | $ 0.00 | $ 9500.00 | Total | $ 3443.17 | $ 3673.91 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

Describe Other Income Notice: Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan."

| B/C | | Monthly Amount |
|---|---|---|
| | | $ |
| | | |
| | | |
| | | |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise, separate Statements and Schedules are required. If the Co-Borrower section was completed about a non-applicant spouse or other person, this Statement and supporting schedules must be completed about that spouse or other person also.  Completed [ ] Jointly [X] Not Jointly

| ASSETS | | Cash or Market Value | Liabilities and Pledged Assets. List the creditor's name, address, and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities, which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | Monthly Payment & Months Left to Pay | Unpaid Balance |
|---|---|---|---|---|---|
| Description | | | LIABILITIES | | |
| Cash deposit toward purchase held by: | | | Name and address of Company | $ Payment/Months | $ |
| | | $ | TOTAL MORTGAGE OBLIGATIONS FROM THE SCHEDULE OF REAL ESTATE OWNED | 3258.00 PER MONTH | 548716.71 |
| List checking and savings accounts below | | $ | | | |
| Name and address of Bank, S&L, or Credit Union WELLS FARGO | | | | | |
| | | | Acct. no. TAXES/INS/MAINT/ETC. | 185.17 | |
| Account Type: CHECKING | | | Name and address of Company PAC CDT SVC | $ Payment/Month PMTS @ 0.00 | $ 1013.00 |
| Acct. no. | $ | 17349.55 | | PER MONTH NOT INCL'D IN RATIOS | |
| Name and address of Bank, S&L, or Credit Union | | | | | |
| | | | Acct. no. 1150260000586929 | $ Payment/Months | $ |
| | | | Name and address of Company VOLVO FINANCE NA | 52 PMTS @ 540.00 | 28290.00 |
| Acct. no. | $ | | | PER MONTH | |
| Name and address of Bank, S&L, or Credit Union | | | | | |
| | | | Acct. no. 39828556 | $ Payment/Months | $ |
| | | | Name and address of Company | | |
| Acct. no. | $ | | | | |
| Name and address of Bank, S&L, or Credit Union | | | | | |
| | | | Acct. no. | $ Payment/Months | $ |
| | | | Name and address of Company | | |
| Acct. no. | $ | | | | |
| Stocks & Bonds (Company name/number & description) | $ | | | | |
| | | | Acct. no. | $ Payment/Months | $ |
| | | | Name and address of Company | | |
| Life insurance net cash value | $ | | | | |
| Face amount $ 0.00 | | | | | |
| Subtotal Liquid Assets | $ | 17349.55 | | | |
| Real estate owned (enter market value from schedule of real estate owned) | $ | 700000 | Acct. no. | $ Payment/Months | $ |
| | | 0.00 | Name and address of Company | | |
| Vested interest in retirement fund | $ | | | | |
| Net worth of business(es) owned (attach financial statement) | $ | | | | |
| Automobiles owned (make and year) | $ | | | | |
| | | | Acct. no. Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | |
| Other Assets (itemize) | $ | | Job-Related Expense (child care, union dues, etc.) | $ | |
| | | | Total Monthly Payments | $ 3983.17 | |
| Total Assets a. | $ | 717349.55 | Net Worth (a minus b) ▶ $ 140342.84 | Total Liabilities b. | $ 577006.71 |

Freddie Mac Form 65 7/05
Fannie Mae Form 1003 7/05

Application 1 of 1
Page 2 of 4

UVD-21N (0507)  CHL (09/05)

## VI. ASSETS AND LIABILITIES (cont'd)

Schedule of Real Estate Owned (if additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| SEE ATTACHED REO SCHEDULE | | | | | | | |
| | | $ | $ | $ | $ | $ | $ |
| | | | | | | | |
| | | | | | | | |
| Totals | $ | 700000 $ | 549717 $ | 0 $ | 3258 $ | 185 $ | 0 |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|

## VII. DETAILS OF TRANSACTION

| | | |
|---|---|---|
| a. Purchase price | $ | 0.00 |
| b. Alterations, improvements, repairs | | 0.00 |
| c. Land (if acquired separately) | | 0.00 |
| d. Refinance (incl. debts to be paid off) | | 540,000.00 |
| e. Estimated prepaid items | | 195.62 |
| f. Estimated closing costs | | 1,571.00 |
| g. PMI, MIP, Funding Fee | | 0.00 |
| h. Discount (if Borrower will pay) | | 24,500.00 |
| i. Total costs (add items a through h) | | 566,266.62 |
| j. Subordinate financing | | 31,500.00 |
| k. Borrower's closing costs paid by Seller | | 0.00 |
| l. Other Credits (explain) OTHER EQUITY | | 0.00 |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | | 560,000.00 |
| n. PMI, MIP, Funding Fee financed | | 0.00 |
| o. Loan amount (add m & n) | | 560,000.00 |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | | -25,233.38 |

## VIII. DECLARATIONS

If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

| | Borrower | | Co-Borrower | |
|---|---|---|---|---|
| | Yes | No | Yes | No |
| a. Are there any outstanding judgments against you? | | X | | |
| b. Have you been declared bankrupt within the past 7 years? | | X | | |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | X | | |
| d. Are you a party to a lawsuit? | | X | | |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name, and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | X | | |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | | X | | |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | | X | | |
| h. Is any part of the down payment borrowed? | | X | | |
| i. Are you a co-maker or endorser on a note? | | X | | |
| j. Are you a U.S. citizen? | X | | | |
| k. Are you a permanent resident alien? | | X | | |
| l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | X | | | |
| m. Have you had an ownership interest in a property in the last three years? | X | | | |
| (1) What type of property did you own — principal residence (PR), second home (SH), or investment property (IP)? | PR | | | |
| (2) How did you hold title to the home — solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | S | | | |

## IX. ACKNOWLEDGEMENT AND AGREEMENT

*(Body text of acknowledgement — small print, illegible)*

## Borrower's Signature
X

Date

## Co-Borrower's Signature
X

Date

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may not discriminate either on the basis of this information, or on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation and surname if you have made this application in person. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER | | | CO-BORROWER | | |
|---|---|---|---|---|---|
| ☐ I do not wish to furnish this information. | | | ☐ I do not wish to furnish this information. | | |
| Ethnicity: | ☐ Hispanic or Latino | X Not Hispanic or Latino | Ethnicity: | ☐ Hispanic or Latino | ☐ Not Hispanic or Latino |
| Race: | ☐ American Indian or Alaska Native | ☐ Asian | Race: | ☐ American Indian or Alaska Native | ☐ Asian |
| | ☐ Black or African American | | | ☐ Black or African American | |
| | ☐ Native Hawaiian or Other Pacific Islander | X White | | ☐ Native Hawaiian or Other Pacific Islander | ☐ White |
| Sex: | ☐ Female | X Male | Sex: | ☐ Female | ☐ Male |

To be Completed by Interviewer
This application was taken by:
☐ Face-to-face interview
☐ Mail
X Telephone 07/27/2006
☐ Internet

Interviewer's Name (print or type)
MARK BAER

Interviewer's Signature

Date

Interviewer's Phone Number (incl. area code)
(888) 973-8383

Name and Address of Interviewer's Employer
COUNTRYWIDE HOME LOANS, INC.

2375 N GLENVILLE DR RGV-B844-2
RICHARDSON, TX 75082

Application 1 of 1

Freddie Mac Form 65 7/05
Fannie Mae Form 1003 7/05

CHL (09/05)

Page 2 of 4

-21N (0507)

Prepared by: ASHLEY WHITESIDE

DATE: 08/26/2006
BORROWER: SHARON BROTHERS
CASE #:
LOAN #: 142989134
PROPERTY ADDRESS: 31 Lincoln St
Watsonville, CA 95076-5028

Branch #: 0000844
2375 N GLENVILLE DR RGV-B844-3
RICHARDSON, TX 75082
Phone: (866)973-8383
Rx Fax No.: (972)781-3683

## SCHEDULE OF REAL ESTATE OWNED
### Page __1__ of __1__

| PROPERTY KEY MAP # | TYPE OF MORTGAGE | ACQUISITION DATE | ACQUISITION COST | % OF OWNERSHIP | MARKET VALUE | STATUS RENTAL/OO | PROPERTY TYPE | PENDING SALE |
|---|---|---|---|---|---|---|---|---|
| 31 Lincoln St Watsonville, CA 95076-5028 | CONV | 01/07/1976 | 130000 | 100.00 | 700000 | OO | SFR | NO |

| | LENDER | | | ACCOUNT NO. | | P & I | BALANCE | % OF LIABILITY | LIABILITY |
|---|---|---|---|---|---|---|---|---|---|
| 1st MORTGAGE | COUNTRYWIDE HOME LOANS 400 COUNTRYWIDE WAY SIMI VALLEY, CA 96035 | | | 114903561 | | 3258.00 | 548718.71 | 100.00 | 548718.71 |
| 2ND LIEN | | | | | | | | | |
| 3RD LIEN | | | | | | | | | |

| RENTAL INCOME | * VACANCY ALLOWANCE | TAXES | MI | HAZARD | DUES | UTILITIES | P & I | % RENTAL | NET RENTAL INCOME |
|---|---|---|---|---|---|---|---|---|---|
| N/A | N/A  N/A | 46.99 | 0.00 | 138.18 | 0.00 | 0.00 | 3258.00 | 0.00 | N/A |

| PROPERTY KEY MAP # | TYPE OF MORTGAGE | ACQUISITION DATE | ACQUISITION COST | % OF OWNERSHIP | MARKET VALUE | STATUS RENTAL/OO | PROPERTY TYPE | PENDING SALE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

| | LENDER | | | ACCOUNT NO. | | P & I | BALANCE | % OF LIABILITY | LIABILITY |
|---|---|---|---|---|---|---|---|---|---|
| 1st MORTGAGE | | | | | | | | | |
| 2ND LIEN | | | | | | | | | |
| 3RD LIEN | | | | | | | | | |

| RENTAL INCOME | * VACANCY ALLOWANCE | TAXES | MI | HAZARD | DUES | UTILITIES | P & I | % RENTAL | NET RENTAL INCOME |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

| | MARKET VALUE | BALANCE | GROSS RENTAL INCOME | P & I | TAXES, INS. MAINTENANCE AND MISC. | NET RENTAL INCOME |
|---|---|---|---|---|---|---|
| TOTALS | 700000 | 548718.71 | 0.00 | 3258.00 | 185.17 | 0.00 |

Signature_____ . Date _____ Signature_____ Date _____

Signature_____ Date _____ Signature_____ Date _____

FHA MORTGAGORS ONLY: "I hereby certify, under penalty of U.S. Criminal Code, Section 1010, Title 18, U.S.C., that I have included in this schedule all the properties I own and/or have under contract, and that the above figures are true and correct and are submitted for the purpose of obtaining mortgage insurance under the National Housing Act."

NOTE: FHA mortgagors who are purchasing or refinancing a rental property and whose total ownership and contracts to purchase residential properties exceed six units, must submit a map showing the location of these properties if six or more are located in the same city/suburban area.

* Vacancy allowance for FHA loans must be at least 5% of rent. Check with local HUD office. / Conv loans: 25%.

FHA/VA/CONV
Schedule of Real Estate Owned
2C065-US (09/01)(d)





# EXHIBIT   D

LOAN #: 142989134

Form **4506-T**
(January 2004)

Department of the Treasury
Internal Revenue Service

### Request for Transcript of Tax Return

▶ **Do not sign this form unless all applicable parts have been completed.**
**Read the instructions on page 2.**
▶ **Request may be rejected if the form is incomplete, illegible, or any required**
**part was blank at the time of signature.**

OMB No. 1545-1872

**TIP:** Use new Form 4506-T to order a transcript or other return information free of charge. See the product list below. You can also call 1-800-829-1040 to order a transcript. If you need a copy of your return, use Form 4506, Request for Copy of Tax Return. There is a fee to get a copy of your return.

| **1a** Name shown on tax return. If a joint return, enter the name shown first. | **1b** First social security number on tax return or employer identification number (see instructions) |
|---|---|
| SHARON BROTHERS | 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 |
| **2a** If a joint return, enter spouse's name shown on tax return | **2b** Second social security number if joint tax return |

**3** Current name, address (including apt., room, or suite no.), city, state, and ZIP code
SHARON BROTHERS
31 Lincoln St, Watsonville, CA 95076-5028

**4** Address, (including apt., room, or suite no.), city, state, and ZIP code shown on the last return filed if different from line 3

**5** If the transcript or tax information is to be mailed to a third party (such as a mortgage company), enter the third party's name, address, and telephone number. The IRS has no control over what the third party does with the tax information.
COUNTRYWIDE HOME LOANS, INC.

4500 Park Granada, Calabasas, CA 91302-1613

**CAUTION:** *Lines 6 and 7 must be completed if the third party requires you to complete Form 4506-T. Do not sign Form 4506-T if the third party requests that you sign Form 4506-T and lines 6 and 7 are blank.*

**6** **Product requested.** Most requests will be processed within 10 business days. If the product requested relates to information from a return filed more than 4 years ago, it may take up to 30 days. Enter the return number here and check the box below. ▶

**a** Return Transcript, which includes most of the line items of a tax return as filed with the IRS. Transcripts are generally available for the following returns: Form 1040 series, Form 1065, Form 1120, Form 1120A, Form 1120H, Form 1120L, and Form 1120S. Return transcripts are available for the current year and returns processed during the prior 3 processing years ☐

**b** Account Transcript, which contains information on the financial status of the account, such as payments made on the account, penalty assessments, and adjustments made by you or the IRS after the return was filed. Return information is limited to items such as tax liability and estimated tax payments. Account transcripts are available for most returns ☐

**c** Record of Account, which is a combination of line item information and later adjustments to the account. Available for current year and 3 prior tax years ☐

**d** Verification of Nonfiling, which is proof from the IRS that you did not file a return for the year ☐

**e** Form W-2, Form 1099 series, Form 1098 series, or Form 5498 series transcript. The IRS can provide a transcript that includes data from these information returns. State or local information is not included with the Form W-2 information. The IRS may be able to provide this transcript information for up to 10 years. Information for the current year is generally not available until the year after it is filed with the IRS. For example, W-2 information for 2003, filed in 2004, will not be available from the IRS until 2005. If you need W-2 information for retirement purposes, you should contact the Social Security Administration at 1-800-772-1213 ☐

**CAUTION:** *If you need a copy of Form W-2 or Form 1099, you should first contact the payer. To get a copy of the Form W-2 or Form 1099 filed with your return, you must use Form 4506 and request a copy of your return, which includes all attachments.*

**7** **Year or period requested.** Enter the ending date of the year or period, using the mm/dd/yyyy format. If you are requesting more than four years or periods, you must attach another Form 4506-T.

**Signature of taxpayer(s).** I declare that I am either the taxpayer whose name is shown on line 1a or 2a, or a person authorized to obtain the tax information requested. If the request applies to a joint return, either husband or wife must sign. If signed by a corporate officer, partner, guardian, tax matters partner, executor, receiver, administrator, trustee, or party other than the taxpayer, I certify that I have the authority to execute Form 4506-T on behalf of the taxpayer.

Telephone number of taxpayer on line 1a or 2a

**Sign Here**

▶ Signature (see instructions)                                    Date

▶ Title (if line 1a above is a corporation, partnership, estate, or trust)

▶ Spouse's signature                                              Date

**For Privacy Act and Paperwork Reduction Act Notice, see page 2.**          Cat. No. 37667N          Form **4506-T** (1-2004)

Page 1 of 2

VMP -9045T (0402).01          CHL (08/04)(d)          VMP Mortgage Solutions, Inc. (800)521-7291





Form 4506-T (1-2004)

LOAN #: 142989134

## A Change To Note

● New Form 4506-T, Request for Transcript of Tax Return, is used to request tax return transcripts, tax account transcripts, W-2 information, 1099 information, verification of non-filing, and a record of account. Form 4506, Request for Copy of Tax Return, is now used only to request copies of tax returns.

## Instructions

**Purpose of form.** Use Form 4506-T to request tax return information. You can also designate a third party to receive the information. See line 5.

**Where to file.** Mail or fax Form 4506-T to the address below for the state you lived in when that return was filed. There are two address charts: one for individual transcripts (Form 1040 series) and one for all other transcripts.

*Note: If you are requesting more than one transcript or other product and the chart below shows two different service centers, mail your request to the service center based on the address of your most recent return.*

### Chart for individual transcripts (Form 1040 series)

| If you lived in and filed an individual return: | Mail or fax to the Internal Revenue Service at: |
|---|---|
| Maine, Massachusetts, New Hampshire, New York, Vermont | RAIVS Team 310 Lowell St. Stop 679 Andover, MA 01810 |
| | 978-691-6859 |
| Alabama, Florida, Georgia, Mississippi, North Carolina, South Carolina, West Virginia, Rhode Island | RAIVS Team 4800 Buford Hwy. Stop 91 Chamblee, GA 30341 |
| | 678-530-5326 |
| Arkansas, Colorado, Kentucky, Louisiana, New Mexico, Oklahoma, Tennessee, Texas | RAIVS Team 3651 South Interregional Hwy. Stop 6716 Austin, TX 78741 |
| | 512-460-2272 |
| Alaska, Arizona, California, Hawaii, Idaho, Montana, Nevada, Oregon, Utah, Washington, Wyoming | RAIVS Team Stop 38101 Fresno, CA 93888 |
| | 559-253-4992 |
| Delaware, Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, Nebraska, North Dakota, South Dakota, Wisconsin | RAIVS Team Stop B41-6700 Kansas City, MO 64999 |
| | 816-823-7667 |
| Ohio, Virginia | RAIVS Team 5333 Getwell Rd. Stop 2826 Memphis, TN 38118 |
| | 901-546-4175 |

Connecticut, District of Columbia, Maryland, New Jersey, Pennsylvania, a foreign country, or A.P.O. or F.P.O. address — RAIVS Team DP SE 135 Philadelphia, PA 19255-0695 — 215-516-2931

### Chart for all other transcripts

| If you lived in: | Mail to the Internal Revenue Service at: |
|---|---|
| Alabama, Alaska, Arizona, Arkansas, California, Colorado, Florida, Georgia, Hawaii, Idaho, Iowa, Kansas, Louisiana, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Tennessee, Texas, Utah, Washington, Wyoming | RAIVS Team Mail Stop 6734 Ogden, UT 84201 |
| | 801-620-6922 |
| Connecticut, Delaware, District of Columbia, Illinois, Indiana, Kentucky, Maine, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Vermont, Virginia, West Virginia, Wisconsin | RAIVS Team P.O. Box 145500 Stop 2800F Cincinnati, OH 45250 |
| | 859-669-3592 |

**Line 1b.** Enter your employer identification number if your request relates to a business return. Otherwise, enter the first social security number (SSN) shown on the return. For example, if you are requesting Form 1040 that includes Schedule C (Form 1040), enter your SSN.

**Signature and date.** Form 4506-T must be signed and dated by the taxpayer listed on line 1a or 2a. If you completed line 5 requesting the information be sent to a third party, the IRS must receive Form 4506-T within 60 days of the date signed by the taxpayer or it will be rejected.

*Individuals.* Transcripts of jointly filed tax returns may be furnished to either spouse. Only one signature is required. Sign Form 4506-T exactly as your name appeared on the original return. If you changed your name, also sign your current name.

*Corporations.* Generally, Form 4506-T can be signed by: (1) an officer having legal authority to bind the corporation, (2) any person designated by the board of directors or other governing body, or (3) any officer or employee on written request by any principal officer and attested to by the secretary or other officer.

*Partnerships.* Generally, Form 4506-T can be signed by any person who was a member of the partnership during any part of the tax period requested on line 7.

*All others.* See section 6103(e) if the taxpayer has died, is insolvent, is a dissolved corporation, or if a trustee, guardian, executor, receiver, or administrator is acting for the taxpayer.

**Documentation.** For entities other than individuals, you must attach the authorization document. For example, this could be the letter from the principal officer authorizing an employee of the corporation or the Letters Testamentary authorizing an individual to act for an estate.

**Privacy Act and Paperwork Reduction Act Notice.** We ask for the information on this form to establish your right to gain access to the requested tax information under the Internal Revenue Code. We need this information to properly identify the tax information and respond to your request. Sections 6103 and 6109 require you to provide this information, including your SSN or EIN. If you do not provide this information, we may not be able to process your request. Providing false or fraudulent information may subject you to penalties.

Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation, and cities, states, and the District of Columbia for use in administering their tax laws. We may also disclose this information to Federal and state agencies to enforce Federal nontax criminal laws and to combat terrorism.

You are not required to provide the information requested on a form that is subject to the Paperwork Reduction Act unless the form displays a valid OMB control number. Books or records relating to a form or its instructions must be retained as long as their contents may become material in the administration of any Internal Revenue law. Generally, tax returns and return information are confidential, as required by section 6103.

The time needed to complete and file Form 4506-T will vary depending on individual circumstances. The estimated average time is: **Learning about the law or the form,** 10 min.; **Preparing the form,** 11 min.; and **Copying, assembling, and sending the form to the IRS,** 20 min.

If you have comments concerning the accuracy of these time estimates or suggestions for making Form 4506-T simpler, we would be happy to hear from you. You can write to the Tax Products Coordinating Committee, Western Area Distribution Center, Rancho Cordova, CA 95743-0001. **Do not** send the form to this address. Instead, see **Where to file** on this page.

# EXHIBIT   E



LandSafe
*A member of the LandSafe family of closing services*

# LANDSAFE VALUE OPINION

| | | | |
|---|---|---|---|
| **Order #:** 5848559 | **Date Review Signed:** 08/24/2006 | | |
| **Borrower:** Sharon Brothers | **Ordered By:** | | |
| **Client:** COUNTRYWIDE - FSLD | **Branch:** 0006094000 | **Fax/E-mail:** REBECCA_KILLIAN@Countrywide.c | |
| **Property Address:** 31 LINCOLN ST | **City:** Watsonville | **State:** CA | **Zip Code:** 95076 |

**Loan Type:** [X] Conventional [ ] FHA/VA    **Property Rights Appraised:** [X] Fee Simple Estate [ ] Leasehold Estate

**Transaction Type:** [X] Rate/Term Refinance [ ] Cash-Out Refinance [ ] Purchase

*If purchase, Sale Price:* $

## ANALYSIS OF AVAILABLE APPRAISAL DOCUMENTATION

**Summation of Available Valuation Reports Under Review:**

| Report Reference | Effective Date | Report Date | Report Form | Appraiser | Appraised Value |
|---|---|---|---|---|---|
| **Original Report** | 08/17/2006 | 08/18/2006 | 1004 | Bass | $672,000 |
| **Second Report** | | 08/21/2006 | LS VO | Fennell | $672,000 |
| **Third Report** | 08/17/2006 | 08/18/2006 | 1004 | Bass | $700,000 |

Original Report is a LandSafe Product? [X] Yes [ ] No

Second Report is a LandSafe Product? [X] Yes [ ] No [ ] Not Applicable

Third Report is a LandSafe Product? [X] Yes [ ] No [ ] Not Applicable

**Other Report(s)** *(If Applicable)*:
prior report dated 9/05 with dated transactions.

**Additional Data Provided by Client:**
SiteX and VF

**Additional LandSafe Data Resources Researched:** CAPES, SiteX, Win2Data, Realtor.com, etc., as needed and available.

**Description of Subject Property:**

| | |
|---|---|
| Type of Property | det, sfr |
| Age of Improvements | 1961 |
| Improvement Size | 1272sf |
| Site Size | 6136sf |

## VALUE OPINION CONCLUSION

**LANDSAFE'S RECOMMENDATION (as applicable)**

**Conventional Loan - LandSafe's Recommended Value:**    [ ] Not Applicable [X] See Value Below

    See Final Value Conclusion at Right/Reviewer's Comments Below, if applicable:    $700,000

**FHA or VA Loan – No Value Estimate will be provided for a FHA or VA Appraisal:**    [X] Not Applicable [ ] See Comments Below

    See Reviewer's Comments Below on Quality Issues for
Reconsideration by Original Appraiser, if applicable.

**Reviewer's Comments:**
See Addendum

*Disclaimer for FHA and VA Appraisals and Loans: FHA and VA will not accept a Value Opinion from LandSafe concerning FHA or VA appraisals. Therefore, the loan officer and/or underwriter should be fully aware that only the original FHA or VA appraiser is able to revise the appraisal report and appraised value. LandSafe still can provide a service of addressing the potential valuation issues with the original FHA or VA appraisal report, to be forwarded or otherwise communicated by the lender to the original appraiser for reconsideration. LandSafe's Value Opinion cannot revise the appraised value for a FHA or VA appraisal and will not be acceptable as a substitute for a FHA or VA appraisal*

**EXHIBIT F**

AA Action Appraisal  1-888-588-5788

8-17-06

File No. 5815139

# APPRAISAL OF



### LOCATED AT:

31 Lincoln St
Watsonville, CA  95076-5028

### FOR:

COUNTRYWIDE - FSLD / Landsafe
1611 Bunker Hill Road Ste 240
Salinas, CA 93906

### BORROWER:

Sharon Brothers

### AS OF:

August 17, 2006

### BY:

Sandy Bass

25-

AA Action Appraisal  1-888-588-5788

AA Action Appraisal

COUNTRYWIDE - FSLD / Landsafe
1611 Bunker Hill Road Ste 240
Salinas, CA 93906

File Number:  5815139

Dear Gentlepersons,

In accordance with your request, I have personally inspected and appraised the real property at:

31 Lincoln St
Watsonville, CA  95076-5028

The purpose of this appraisal is to estimate the market value of the subject property, as improved.
The property rights appraised are the fee simple interest in the site and improvements.

In my opinion, the estimated market value of the property as of   August 17, 2006          is:

$672,000
Six Hundred Seventy-Two Thousand  Dollars

The attached report contains the description, analysis and supportive data for the conclusions,
final estimate of value, descriptive photographs, limiting conditions and appropriate certifications.

Sincerely,

Sandy Bass

AA ACTION APPRAISAL 1-888-588-5788

# Uniform Residential Appraisal Report

File No. 5815139

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

**SUBJECT**

| Property Address 31 Lincoln St | City Watsonville | State CA | Zip Code 95076-5028 |
|---|---|---|---|

Borrower Sharon Brothers — Owner of Public Record SHARON BROTHERS — County Santa Cruz

Legal Description See preliminary title report.

Assessor's Parcel # 017-273-20-000 — Tax Year 2005 — R.E. Taxes $ 537.00

Neighborhood Name Watsonville — Map Reference 1015-H2 — Census Tract 1103.00

Occupant [X] Owner [ ] Tenant [ ] Vacant — Special Assessments $ 0.00 — [ ] PUD — HOA $ 0.00 [ ] per year [ ] per month

Property Rights Appraised [X] Fee Simple [ ] Leasehold [ ] Other (describe)

Assignment Type [ ] Purchase Transaction [X] Refinance Transaction [ ] Other (describe)

Lender/Client COUNTRYWIDE - FSLD / Landsafe — Address 1611 Bunker Hill Road Ste 240, Salinas, CA 93906

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? [ ] Yes [X] No

Report data source(s) used, offering price(s), and date(s).

**CONTRACT**

[ ] did [X] did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $ 0 — Date of Contract — Is the property seller the owner of public record? [ ] Yes [ ] No — Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? [ ] Yes [ ] No

If Yes, report the total dollar amount and describe the items to be paid. $

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | One-Unit Housing Trends | | One-Unit Housing | | Present Land Use % |
|---|---|---|---|---|---|---|
| Location [ ] Urban [X] Suburban [ ] Rural | Property Values [X] Increasing [ ] Stable [ ] Declining | PRICE $(000) | AGE (yrs) | One-Unit 65 % |
| Built-Up [X] Over 75% [ ] 25-75% [ ] Under 25% | Demand/Supply [ ] Shortage [X] In Balance [ ] Over Supply | 235 Low | 0 | 2-4 Unit 5 % |
| Growth [ ] Rapid [X] Stable [ ] Slow | Marketing Time [ ] Under 3 mths [X] 3-6 mths [ ] Over 6 mths | 235 Low | 0 | Multi-Family 10 % |
| | | 943 High | 99 | Commercial 10 % |
| | | 670 Pred. | 51 | Other Vacant 10 % |

Neighborhood Boundaries San Juan Rd to the south; Riverside Dr to the east; Holohan Rd to the north; Green Valley Rd to the west;

Neighborhood Description See Attached Addendum

Market Conditions (including support for the above conclusions) Market conditions here are considered average with fairly balanced supply and demand. These conditions are expected to continue this way as long as interest and employment rates remain stable. Although seller concessions are not uncommon, most sales occur without seller concessions.

**SITE**

| Dimensions 59' x 104' | Area 6136 ± Sq.Ft. | Shape Rectangular | View Neighborhood |
|---|---|---|---|

Specific Zoning Classification RM-3 — Zoning Description Multiple Residential - High Density, Single Family permitted

Zoning Compliance [X] Legal [ ] Legal Nonconforming (Grandfathered Use) [ ] No Zoning [ ] Illegal (describe)

Is the highest and best use of the subject property as improved (or as proposed per plans and specifications) the present use? [X] Yes [ ] No If No, describe. Given the physical characteristics and the zoning of the subject, the highest and best use is SFR.

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements—Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | | Water | [X] | | Street Asphalt | [X] | |
| Gas | [X] | | Sanitary Sewer | [X] | | Alley None | | |

FEMA Special Flood Hazard Area [X] Yes [ ] No — FEMA Flood Zone AO — FEMA Map # 060357 - 0411D — FEMA Map Date 03/02/2006

Are the utilities and off-site improvements typical for the market area? [X] Yes [ ] No If No, describe.

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? [ ] Yes [X] No If Yes, describe. No readily apparent adverse site conditions or external factors are noted, except the site is near the river.

**IMPROVEMENTS**

| GENERAL DESCRIPTION | FOUNDATION | EXTERIOR DESCRIPTION materials/condition | INTERIOR materials/condition |
|---|---|---|---|
| Units [X] One [ ] One with Accessory Unit | [ ] Concrete Slab [X] Crawl Space | Foundation Walls Concrete/Ave | Floors Wood/Vinyl/Ave |
| # of Stories 1 | [ ] Full Basement [ ] Partial Basement | Exterior Walls Wood/Ave | Walls Drywall/Ave |
| Type [X] Det. [ ] Att. [ ] S-Det./End Unit | Basement Area None sq. ft. | Roof Surface Comp Shngl/Ave | Trim/Finish Ave/Ave |
| [X] Existing [ ] Proposed [ ] Under Const. | Basement Finish N/A % | Gutters & Downspouts Metal/Ave | Bath Floor Vinyl/Ave |
| Design (Style) Ranch | [ ] Outside Entry/Exit [ ] Sump Pump | Window Type SP Alum/Ave | Bath Wainscot Tile/Ave |
| Year Built 1961 | Evidence of [ ] Infestation | Storm Sash/Insulated No/Unknown | Car Storage [ ] None |
| Effective Age (Yrs) 30 | [ ] Dampness [ ] Settlement | Screens Yes/Ave | [ ] Driveway # of Cars |
| Attic [X] None | Heating [ ] FWA [ ] HWBB [ ] Radiant | Amenities | Driveway Surface Concrete |
| [ ] Drop Stair [ ] Stairs | [X] Other Wall Fuel Gas | [ ] WoodStove(s) # | [X] Garage # of Cars 2 |
| [ ] Floor [ ] Scuttle | Cooling [ ] Central Air Conditioning | [ ] Fireplace(s) # [X] Fence Wood | [ ] Carport # of Cars |
| [ ] Finished [ ] Heated | [ ] Individual [ ] Other | [X] Patio/Deck Con [X] Porch Covered | [ ] Att. [X] Det. [ ] Built-in |
| Appliances [P] Refrigerator [X] Range/Oven [ ] Dishwasher [ ] Disposal [ ] Microwave [P] Washer/Dryer [ ] Other (describe) | | [ ] Pool [ ] Other | |

Finished area above grade contains: 5 Rooms 3 Bedrooms 2 Bath(s) 1,272 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.) The subject has an alarm system, covered entry, a patio behind the home and a detached garage with a storage area.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.) The subject is considered to be in typical condition and it has a functional floorplan. No inadequacies observed. The bathrooms were remodeled and new wood floors were installed 7 years ago. The appraisers ability to make comments regarding the foundation was limited because the foundation is obscured from view of the appraiser.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? [ ] Yes [X] No If Yes, describe. The appraiser is not a licensed contractor or building inspector. No-one should rely on this appraisal as a substitute for a home inspection. The appraiser is not a trained professional in environmental conditions; however, no apparent conditions were observed.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? [X] Yes [ ] No If No, describe.

AA ACTION APPRAISAL 1-888-588-5788

## Uniform Residential Appraisal Report

File No. 5815139

| There are | 2 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 685,000 to $ 690,000 |
| There are | 3 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 659,000 to $ 689,000 |

| FEATURE | SUBJECT | COMPARABLE SALE NO. 1 | | COMPARABLE SALE NO. 2 | | COMPARABLE SALE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 31 Lincoln St Watsonville | 447 Carolyn Ct Watsonville, CA 95076 | | 778 McKenzie Av Watsonville, CA 95076 | | 24 Wilkie Av Watsonville, CA 95076 | |
| Proximity to Subject | | 0.41 miles N | | 0.82 miles NNE | | 0.81 miles N | |
| Sale Price | $ 0 | | $ 669,000 | | $ 689,000 | | $ 659,000 |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 488.32 sq. ft. | | $ 592.94 sq. ft. | | $ 527.20 sq. ft. | |
| Data Source(s) | | MLS# 562655 Doc# 25242 | | MLS# 608931 Doc# 17501 | | MLS# 558439 Doc# 25238 | |
| Verification Source(s) | | MLS/RealQuest | | MLS/RealQuest | | MLS/RealQuest | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing Concessions | 0 | Conv. DOM: 98 | | Conv. DOM: 4 | | Conv. DOM: 140 | |
| Date of Sale/Time | | 04/28/2006 | | 03/29/2006 | | 04/28/2006 | |
| Location | Suburban | Suburban | | Suburban | | Suburban | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 6,136 ± Sq.Ft. | 5,619 Sq.Ft. | | 6,403 Sq.Ft. | | 7,013 Sq.Ft. | |
| View | Neighborhood | Similar | | Similar | | Similar | |
| Design (Style) | Bungalow | Bungalow | | Traditional | | Bungalow | |
| Quality of Construction | Average | Average | | Average | | Average | |
| Actual Age | 1961 ± | 1950 | -6,000 | 1975 | -5,000 | 1925 | 5,500 |
| Condition | Average/E30 | Superior/E25 | | Superior/E25 | | Inferior/E35 | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 5  3  2 | 5  3  2 | | 6  3  2 | | 5  3  2 | |
| Gross Living Area | 60.00    1,272 sq. ft. | 1,370 sq. ft. | 0 | 1,162 sq. ft. | 6,500 | 1,250 sq. ft. | |
| Basement & Finished | None | None | | None | | None | |
| Rooms Below Grade | None | None | | None | | None | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Wall Furn/None | Wall Furn/None | | FAU/None | -3,000 | FAU/None | -3,000 |
| Energy Efficient Items | Typical | Typical | | Typical | | Typical | |
| Garage/Carport | 2 Car Garage | 1 Car Garage | 6,000 | 2 Car Garage | | 1 Car Garage | 6,000 |
| Porch/Patio/Deck | Patio/Deck, Porch | Similar | | Similar | | Similar | |
| Fireplace | None | 1 Fireplace | -3,500 | 1 Fireplace | -3,500 | 1 Fireplace | -3,500 |
| Net Adjustment (Total) | | [ ]+ [X]- $ | 3,500 | [ ]+ [X]- $ | 5,000 | [X]+ [ ]- $ | 5,000 |
| Adjusted Sale Price of Comparables | | Net Adj. -0.5% Gross Adj. 2.3% $ | 665,500 | Net Adj. -0.7% Gross Adj. 2.6% $ | 684,000 | Net Adj. 0.8% Gross Adj. 2.7% $ | 684,000 |

I [X] did [ ] did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research [ ] did [X] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data source(s)  MLS, RealQuest
My research [ ] did [X] did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data source(s)  MLS, RealQuest
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE NO. 1 | COMPARABLE SALE NO. 2 | COMPARABLE SALE NO. 3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | N/A | N/A | N/A | N/A |
| Price of Prior Sale/Transfer | 0 | 0 | 0 | 0 |
| Data Source(s) | RealQuest | RealQuest | RealQuest | RealQuest |
| Effective Date of Data Source(s) | 08/09/2006 | 08/09/2006 | 08/09/2006 | 08/09/2006 |

Analysis of prior sale or transfer history of the subject property and comparable sales   The subject has not been listed on the MLS within the past year, or sold within the past 3 years per MLS/RealQuest. There is no known sales contract on the subject property at this time. None of the Comp's have sold within the past 1 year per MLS/RealQuest.

Summary of Sales Comparison Approach.  See Attached Addendum

Indicated Value by Sales Comparison Approach $ 672,000
Indicated Value by: Sales Comparison Approach $ 672,000   Cost Approach (if developed) $ 684,600   Income Approach (if developed) $ 0
Most weight given to the Sales Comparison & Market Data Analysis because it is the best reflection of current market activity. The Cost Approach provides basic support for this conclusion. The Income approach was not used due to lack of viable rent data and because most homes in the subject's neighborhood are purchased for owner occupancy.
This appraisal is made [X] "as is", [ ] subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, [ ] subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or [ ] subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:  See Attached Addendum.

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 672,000
as of  08/17/2006 , which is the date of inspection and the effective date of this appraisal.

Freddie Mac Form 70 March 2005                Produced using ACI software, 800.234.8727 www.aciweb.com        Page 2 of 6                Fannie Mae Form 1004 March 2005
1004_05.05 05005

AA ACTION APPRAISAL 1-888-588-5788

# Uniform Residential Appraisal Report

File No. 5815139

**Scope of Work;** I viewed the interior and exterior of the subject improvements and the subject site on the effective date of the appraisal report and gathered information from the subject's neighborhood. I have made the extraordinary assumption that the interior of the subject property is average for the subject's market area. I researched public county records regarding the ownership, site size, age, legal description, APN, yearly tax assessments, map reference, census trac, parcel map. and transaction history of the subject. I researched FEMA Flood data to determine whether the subject is in a flood zone.. I used information from county records, real estate agents, owner's comments, assessor's records and the multiple listing service data to identify the characteristics of the subject property that are relevant to the valuation problem. I examined the subject's market area to determine the existing and proposed inventory, as well as demand for and marketability of the property with the subject's classification. Sales of similar properties that have sold over the past 6 months, within 1 mile of the subject were research in the subject's neighborhood. Comparables were chosen on their location, age, condition, gross living area, number of bedrooms & bathrooms and site size. I researched data on comparable improved sales information from the MLS and analyzed the information gathered it in and applied the cost and sales comparison approach. After selection of the sales, a comparative analysis of relevant factors that influence value was undertaken to adjust the sales to the subject property based upon the actions and preferences demonstrated by participants in the marketplace. I researched and analyzed the Comparables transaction history. The data was analyzed in a Summary Report. In the cost approach replacements cost is used to develop a value indication for the subject property. The subject did not have an attic or basement to inspect. The scope of work also includes items mentioned in the Assumptions and Limiting conditions of this appraisal report, as well as those mentioned through out the report. In the reconciliation, I considered the quantity and quality of the data available under each approach, the advantages and/or the disadvantages of each approach, and the relevance of each to the subject property and the appraisal Results of the analysis are summarized into a summary report. I have considered all three approaches to value and then reconciled to arrive at a final opinion of value for the subject property. Two approaches to value have been used in arriving at an opinion of value of the fee simple interest in the subject property. Most weight given to the Sales Comparison & Market Data Analysis because it is the best reflection of current market activity. The Cost Approach provides basic support for this conclusion. The Income approach was not used due to lack of viable rent data and because most homes in the subject's neighborhood are purchased for owner occupancy. I applied the sales comparison and cost approaches which are necessary for credible results given the intended us, property characteristics, and type of value sought. The appraisal did not warrant an intensive highest and best use study. Given the nature of the subject real estate, my conclusion of highest and best use was abased on logic and observed evidence.

## COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value) **The site value was determined by abstraction. The appraiser estimated replacement cost, subtracted the appropriate amount for depreciation, and subtracted the remainder from the adjusted sales price to estimate the land value. Comparable 2 was used to determine the subject site value.**

| ESTIMATED | REPRODUCTION OR | X | REPLACEMENT COST NEW | OPINION OF SITE VALUE | | | = $ | 533,000 |
|---|---|---|---|---|---|---|---|---|
| Source of cost data Marshall & Swift and Local Contractors | | | | Dwelling | 1,272 Sq. Ft. @ $ | 150.00 | = $ | 190,800 |
| Quality rating from cost service Average | Effective date of cost data 3/2005 | | | Bsmt. 0 | Sq. Ft. @ $ | | = $ | 0 |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | | | Concrete Patio | | | | 1,000 |
| See Attached Addendum. | | | | Garage/Carport 528 | Sq. Ft. @ $ | 40.00 | = $ | 21,120 |
| | | | | Total Estimate of Cost-New | | | = $ | 212,920 |
| | | | | Less 75 Physical Functional External | | | | |
| | | | | Depreciation $76,320 | | | = $ ( | 76,320 |
| | | | | Depreciated Cost of Improvements | | | = $ | 136,600 |
| | | | | "As-is" Value of Site Improvements | | | = $ | 15,000 |
| Estimated Remaining Economic Life (HUD and VA only) | 45 Years | | | INDICATED VALUE BY COST APPROACH | | | = $ | 684,600 |

## INCOME APPROACH TO VALUE (not required by Fannie Mae)

| Estimated Monthly Market Rent $ | 0.00 | X Gross Rent Multiplier | N/A | = $ | 0 | Indicated Value by Income Approach |
|---|---|---|---|---|---|---|

Summary of Income Approach (including support for market rent and GRM) **The Income Approach was not used due to lack of viable rental data and because most homes in the subject's neighborhood are purchased for owner occupancy.**

## PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☐ No  Unit type(s) ☐ Detached ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal name of project

| Total number of phases | | Total number of units | | Total number of units sold | |
|---|---|---|---|---|---|
| Total number of units rented | | Total number of units for sale | | Data source(s) | |

Was the project created by the conversion of an existing building(s) into a PUD? ☐ Yes ☐ No  If Yes, date of conversion.

Does the project contain any multi-dwelling units? ☐ Yes ☐ No  Data source(s)

Are the units, common elements, and recreation facilities complete? ☐ Yes ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

AA ACTION APPRAISAL 1-888-588-5788

## Uniform Residential Appraisal Report

File No. 5815139

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

SCOPE OF WORK: The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

INTENDED USE: The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

INTENDED USER: The intended user of this appraisal report is the lender/client.

DEFINITION OF MARKET VALUE: The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS: The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1.   The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2.   The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3.   The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4.   The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5.   The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6.   The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

AA ACTION APPRAISAL 1-888-588-5788

## Uniform Residential Appraisal Report

File No. 5815139

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

AA ACTION APPRAISAL 1-888-588-5788

# Uniform Residential Appraisal Report

File No. 5815139

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, and conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature _Sandy Bass_ | Signature _____ |
| Name Sandy Bass | Name _____ |
| Company Name AA Action Appraisal | Company Name _____ |
| Company Address Encinal Box J | Company Address _____ |
| Sunnyvale, CA 94087 | |
| Telephone Number 1-888-588-5788 | Telephone Number _____ |
| Email Address aaactionappraisal@yahoo.com | Email Address _____ |
| Date of Signature and Report 08/18/2006 | Date of Signature _____ |
| Effective Date of Appraisal 08/17/2006 | State Certification # _____ |
| State Certification # AL029698 | or State License # _____ |
| or State License # AL029698 | State _____ |
| or Other (describe) _____ State # _____ | Expiration Date of Certification or License _____ |
| State CA | |
| Expiration Date of Certification or License 11/19/2006 | |

ADDRESS OF PROPERTY APPRAISED
31 Lincoln St
Watsonville, CA  95076-5028

APPRAISED VALUE OF SUBJECT PROPERTY $ 672,000

LENDER/CLIENT
Name _____
Company Name COUNTRYWIDE - FSLD / Landsafe
Company Address 1611 Bunker Hill Road Ste 240
Salinas, CA 93906
Email Address _____

SUBJECT PROPERTY
☐ Did not inspect subject property
☐ Did inspect exterior of subject property from street
   Date of Inspection _____
☐ Did inspect interior and exterior of subject property
   Date of Inspection _____

COMPARABLE SALES
☐ Did not inspect exterior of comparable sales from street
☐ Did inspect exterior of comparable sales from street
   Date of Inspection _____

eAction Appraisal

AA ACTION APPRAISAL 1-888-588-5788

# Uniform Residential Appraisal Report

File No. 5815139

| FEATURE | SUBJECT | COMPARABLE SALE NO. 4 | | COMPARABLE SALE NO. 5 | | COMPARABLE SALE NO. 6 | |
|---|---|---|---|---|---|---|---|
| Address 31 Lincoln St Watsonville | | 574 Creek Dr Watsonville, CA 95076 | | | | | |
| Proximity to Subject | | 0.62 miles NNE | | | | | |
| Sale Price | $ 0 | $ 642,500 | | $ | | $ | |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 552.93 sq. ft. | | $ sq. ft. | | $ sq. ft. | |
| Data Source(s) | | MLS# 613031  Closed per RE Agent | | | | | |
| Verification Source(s) | | MLS/RealQuest | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing Concessions | 0 | Conv. DOM: 89 | | | | | |
| Date of Sale/Time | | 08/14/2006 | | | | | |
| Location | Suburban | Suburban | | | | | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | | | | |
| Site | 6,136 ± Sq.Ft. | 5,924 Sq.Ft. | | | | | |
| View | Neighborhood | Similar | | | | | |
| Design (Style) | Bungalow | Bungalow | | | | | |
| Quality of Construction | Average | Average | | | | | |
| Actual Age | 1961 ± | 1974 | -5,000 | | | | |
| Condition | Average/E30 | Superior/E25 | | | | | |
| Above Grade | Total  Bdrms.  Baths | Total  Bdrms.  Baths | | Total  Bdrms.  Baths | | Total  Bdrms.  Baths | |
| Room Count | 5   3   2 | 5   3   2 | | | | | |
| Gross Living Area | 60.00   1,272 sq. ft. | 1,162 sq. ft. | 6,500 | sq. ft. | | sq. ft. | |
| Basement & Finished Rooms Below Grade | None None | None None | | | | | |
| Functional Utility | Average | Average | | | | | |
| Heating/Cooling | Wall Furn/None | FAU/None | -3,000 | | | | |
| Energy Efficient Items | Typical | Typical | | | | | |
| Garage/Carport | 2 Car Garage | 2 Car Garage | | | | | |
| Porch/Patio/Deck | Patio/Deck,Porch | Similar | | | | | |
| Fireplace | None | 1 Fireplace | -3,500 | | | | |
| Net Adjustment (Total) | | ☐ +  ☒ - $ 5,000 | | ☒ + ☐ - $ 0 | | ☒ + ☐ - $ 0 | |
| Adjusted Sale Price of Comparables | | Net Adj.  -0.8% Gross Adj.  2.8% $ 637,500 | | Net Adj. 0.0% Gross Adj. 0.0% $ 0 | | Net Adj. 0.0% Gross Adj. 0.0% $ 0 | |
| ITEM | SUBJECT | COMPARABLE SALE NO. 4 | | COMPARABLE SALE NO. 5 | | COMPARABLE SALE NO. 6 | |
| Date of Prior Sale/Transfer | N/A | N/A | | | | | |
| Price of Prior Sale/Transfer | 0 | 0 | | | | | |
| Data Source(s) | RealQuest | RealQuest | | | | | |
| Effective Date of Data Source(s) | 08/09/2006 | 08/09/2006 | | | | | |

Summary of Sales Comparison Approach

**Neighborhood Description**
The subject is located in the city of Watsonville. Watsonville, located in the extreme southern portion of Santa Cruz county, has a population of approximately 30,000 people; and relies on agriculture and related business for its economic support. Watsonville provides for regional shopping, schools, both private and public. Major employment, beyond the local ag. industries is located on Santa Cruz, about 20 minutes north and San Jose " Silicon Valley" about 60 minutes north. The immediate area is improved with detached single family homes, mobile home parks and commercial use along Freedom Blvd., to the west.

**Comments on Sales Comparison**
Comparables are chosen on their location, age, condition, gross living area, number of bedrooms & bathrooms and site size. No specific comparable is completed the same as the subject. Comparable 1 is a newer home than the subject with a remodeled kitchen, a smaller garage and was adjusted accordingly. Comparable 2 is a newer home, has been upgraded and was adjusted accordingly. Comparable 3 is an older home than the subject, has a remodeled kitchen and was adjusted accordingly. Comparable 4 is a newer, smaller home than the subject and was adjusted accordingly. Most weight was given to Comparable 1 to 3.

There have been few sales of properties similar to the subject over the past year. Those used in this report are considered to be the most recent and comparable available.

Age/condition adjustments were made using a formula that uses the replacement cost per sq ft, the difference in effective age between the Comp. and the subject, and the living area.

Some pictures of Comparables were taken from the MLS.

**Conditions of Appraisal**
The purpose of this appraisal is to estimate the value of the subject for mortgage collateral. The scope of the appraisal involves inspecting the subject property, gathering sales data, and analyzing the data in a summary report. The appraisal is credible within the context of the intended use. The intended user of this appraisal report is the Lender/Client. The intended use is to evaluate the property that is the subject of this appraisal for a mortgage finance transaction, subject to the stated scope of work, purpose of this appraisal report, and definition of market value. No additional intended users are identified by the appraiser.

**Cost Approach Comments**
Most cost figures taken from Marshall & Swift Cost Handbook, interviews with local contractors, and the appraiser's past personal experience. Plans and permits costs are figured into the building base cost. The land to improvement ratio is normal for this area and price range. Land value was determined by abstraction. The subject property has an Estimated Economic Life in excess of 40 years. Replacement cost figures used in the cost approach are for valuation purposes only. No client or third party should rely on these figures for insurance purposes.

**USPAP COMPLIANCE ADDENDUM**                                               File No. 5815139

**APPRAISER'S CERTIFICATION:**
The following Certification statements are in addition to and may supercede the signed Appraiser's Certification attached to this appraisal report. This Appraiser's Certification is compliant with the current edition of the Uniform Standards of Professional Appraisal Practice.

I certify that, to the best of my knowledge and belief:

The statements of fact contained in this report are true and correct.
The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

I have no bias with respect to the property that is the subject of this report or to the parties invoved with this assignment.

My engagement in this assignment was not contingent upon developing or reporting predetermined results.

My compensation for completing this assignement is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

I  [X] have  [ ] have not made a personal inspection of the property that is the subject of this report. (If more than one person signs this certification, the certification must clearly specify which individuals did and which individuals did not make a personal inspection of the appraised property.)

No one provided significant real property appraisal assistance to the person signing this certification. (If there are exceptions, the name of each individual providing significant real property appraisal assistance must be stated.)

**PURPOSE, INTENDED USE, AND INTENDED USER OF THE APPRAISAL:**
The purpose of the appraisal is to estimate the market value of the subject property, as defined in this report, as of the effective date of this report. The intended use of the appraisal is to assist the client and any other intended users in the underwriting, approval, and funding of the mortgage loan. The intended users of this report are the stated client and any other institutions involved in the underwriting , approval, and funding of the mortgage loan. No one else, including the purchaser and seller, should rely on the estimate of value or any other conclusions contained in this appraisal report.

**ANALYSIS AND REPORT FORM:**
The appraisal is based on the information gathered by the appraiser from public records, other identified sources, inspection of the subject property and neighborhood, and selection of comparable sales, listings, and/or rentals within the subject market area.

The original source of the comparable data described in the Data Source section of the market grid along with the source of confirmation provided, where available, the original source is presented first. The sources and data are considered reliable. When conflicting information was provided, source deemed most reliable has been used. Data believed to be unreliable was not included in the report or used as a basis for the value conclusion. The extent of the analysis to this assignment is stated in the Appraiser's Certification included above and attached to this report.

**DEFINITION OF INSPECTION:**
The term "Inspection", as used in this report, is not the same level of inspection that is required for a "Professional Home Inspection". The appraiser does not fully inspect the electrical system, plumbing systems, mechanical systems, foundation system, floor structure, or subfloor. The appraiser is not an expert in construction materials and the purpose of the appraisal is to make an economic evaluation of the subject property. If the client needs a more detailed inspection of the property, a home inspection, by a Professional Home Inspector, is suggested.

**DIGITAL SIGNATURES:**
The signature(s) affixed to this report, and certification, were applied by the original appraiser(s) or supervisory appraiser and represent their acknowledgements of the facts, opinions and conclusions found in the report. Each appraiser(s) applied his or her signature electronically using a password encrypted method. Hence these signatures have more safeguards and carry the same validity as the individual's hand applied signature. If the report has a hand-applied signature, this comment does not apply.

**OPINION OF MARKET VALUE VS ESTIMATE OF MARKET VALUE:**
The current Uniform Standards of Professional Appraisal Practice defines the market value conclusion as an opinion of market value and not an estimate of market value.

**THREE YEAR SALES HISTORY FOR THE SUBJECT PROPERTY:**
The appraiser has complied with Standards Rule 1-5b and 2-2b (ix) requiring the appraiser to analyze and report all sales of the subject property that occurred within the three (3) years prior to the effective date of the appraisal. If this information was available to the appraiser(s), it is reported in the subject column of Sales Comparison Analysis section of the appraisal report.

**EXPOSURE PERIOD:**
By studying the sales of similar comparable residential properties with value ranges as identified in the Neighborhood section of this report and discussions with individuals knowledgeable of current neighborhood trends in the subject area, the appraiser feels that the exposure time for the subject property is equal to the indicated Marketing Time identified in the Neighborhood section of this appraisal report.

| **APPRAISER:** | | **SUPERVISORY APPRAISER:** | | |
|---|---|---|---|---|
| Signature *Sandy Bass* | | Signature | [ ] Did | [ ] Did Not |
| Name Sandy Bass | | Name | | Inspect Property |
| Date Report Signed 08/18/2006 | | Date Report Signed | | |
| State Certification # AL029698 | State CA | State Certification # | | State |
| Or State License # AL029698 | State CA | Or State License # | | State |

**FLOORPLAN**

| | |
|---|---|
| Borrower: Sharon Brothers | File No.: 5815139 |
| Property Address: 31 Lincoln St | Case No.: |
| City: Watsonville | State: CA | Zip: 95076-5028 |
| Lender: COUNTRYWIDE - FSLD / Landsafe | |



Garage

Living Area*

**Living Area***

| | | | |
|---|---|---|---|
| 24.5 | x 42 | = 1029 | |
| 13.5 | x 18 | = 243 | |
| | Subtotal* | 1272 | SF |

Concrete Patio

| | | | |
|---|---|---|---|
| 11 | x 17 | = 187 | SF |

Covered Porch

| | | | |
|---|---|---|---|
| 4 | x 13.5 | = 54 | SF |

| Total* | | 1272 | SF |

**Garage**

2 Car Garage

| | | | | |
|---|---|---|---|---|
| 17.5 | x 22 | = | 385 | SF |

Storage Area

| | | | | |
|---|---|---|---|---|
| 6.5 | x 22 | = | 143 | SF |
| Total | | | 528 | SF |
| * Total G.L.A. | | | 1272 | SF |
| Total OTHER | | | 528 | SF |

Scale 1:120

Software by Dynamic Computing (850) 894-2719

1" = 10'

**PLAT MAP**

| | |
|---|---|
| Borrower: Sharon Brothers | File No.: 5815139 |
| Property Address: 31 Lincoln St | Case No.: |
| City: Watsonville | State: CA    Zip: 95076-5028 |
| Lender: COUNTRYWIDE - FSLD / Landsafe | |



FOR TAX PURPOSES ONLY

CITY OF WATSONVILLE   Tax Area Code
2-078   69-288

17-27

Note - Assessor's Parcel Block &
Lot Numbers Shown in Circles.

Assessor's Map No. 17-27
City of Watsonville
County of Santa Cruz, Calif.

**LOCATION MAP**

| | | | |
|---|---|---|---|
| Borrower: Sharon Brothers | | File No.: 5815139 | |
| Property Address: 31 Lincoln St | | Case No.: | |
| City: Watsonville | State: CA | | Zip: 95076-5028 |
| Lender: COUNTRYWIDE - FSLD / Landsafe | | | |



SUBJECT PROPERTY PHOTO ADDENDUM

| | | | |
|---|---|---|---|
| Borrower: Sharon Brothers | | File No.: 5815139 | |
| Property Address: 31 Lincoln St | | Case No.: | |
| City: Watsonville | State: CA | | Zip: 95076-5028 |
| Lender: COUNTRYWIDE - FSLD / Landsafe | | | |



**FRONT VIEW OF
SUBJECT PROPERTY**

Appraised Date: August 17, 2006
Appraised Value: $ 672,000



**REAR VIEW OF
SUBJECT PROPERTY**



**STREET SCENE**

| Borrower: Sharon Brothers | | File No.: 5815139 |
|---|---|---|
| Property Address: 31 Lincoln St | | Case No.: |
| City: Watsonville | State: CA | Zip: 95076-5028 |
| Lender: COUNTRYWIDE - FSLD / Landsafe | | |



LIVING ROOM OF SUBJECT



KITCHEN OF SUBJECT



DINING AREA OF THE SUBJECT

**ARABLE PROPERTY PHOTO ADDENDUM**

| | | | |
|---|---|---|---|
| Borrower: Sharon Brothers | | File No.: 5815139 | |
| Property Address: 31 Lincoln St | | Case No.: | |
| City: Watsonville | State: CA | | Zip: 95076-5028 |
| Lender: COUNTRYWIDE - FSLD / Landsafe | | | |



**COMPARABLE SALE #1**

447 Carolyn Ct
Watsonville, CA 95076
Sale Date: 04/28/2006
Sale Price: $ 669,000



**COMPARABLE SALE #2**

778 McKenzie Av
Watsonville, CA 95076
Sale Date: 03/29/2006
Sale Price: $ 689,000



**COMPARABLE SALE #3**

24 Wilkie Av
Watsonville, CA 95076
Sale Date: 04/28/2006
Sale Price: $ 659,000

COMPARABLE PROPERTY PHOTO ADDEN...

| | |
|---|---|
| Borrower: Sharon Brothers | File No.: 5815139 |
| Property Address: 31 Lincoln St | Case No.: |
| City: Watsonville | State: CA   Zip: 95076-5028 |
| Lender: COUNTRYWIDE - FSLD / Landsafe | |



**COMPARABLE SALE #4**

574 Creek Dr
Watsonville, CA  95076
Sale Date: 08/14/2006
Sale Price: $ 642,500



**COMPARABLE SALE #5**

Sale Date:
Sale Price: $

**COMPARABLE SALE #6**

Sale Date:
Sale Price: $

**Order Form**

## General

| | | | |
|---|---|---|---|
| File No.: | 5815139 | Loan Type: | |
| Case No: | | Job Type: | |
| Client File No.: | 0885D74EC | Property Type: | |
| Tracking No.: | 5815139 | Form Type: | |
| Filename: | E:\Program Files\ACI32\REPORTS\5815139.aci | | |

## Property Information

| | | | | | |
|---|---|---|---|---|---|
| Address: | 31 Lincoln St | | | | |
| City: | Watsonville | County: Santa Cruz | St: CA | Zip: 95076-5028 | |
| Location: | | Map No: 1015-H2 | | Census: 1103.00 | |
| Legal: | See preliminary title report. | | | | |
| Sale Price: | $0 | ☐ Refinance | Loan Amt: | Date of Sale: | |
| Rooms: | 5 | Bedrooms: 3 | Baths: 2.00 | Appraised Value: $672,000 | |
| Borrower | First: Sharon | Last: Brothers | Owner: SHARON BROTHERS | | |

## Status:

**Dates**

| | |
|---|---|
| Ordered: | |
| Due: | |
| Assigned: | |
| Inspected: | 08/17/2006 |
| Reviewed: | |
| Signed: | 08/18/2006 |
| Delivered: | |
| Fax/EDI: | |
| Involced: | |
| User Defined: | |
| Cancelled: | |
| Paid: | |

## Client Information      ☒ Ordered By      ☐ Bill To      ☐ Send To

| | |
|---|---|
| Client: | COUNTRYWIDE - FSLD / Landsafe |
| Branch: | 0006094000 |
| Address: | 1611 Bunker Hill Road Ste 240 |
| City: | Salinas | State: CA | Zip: 93906 |
| Phone: | Fax: |
| Contact: | |
| Misc: | |

## Billing Information

| | |
|---|---|
| Invoice No.: | |
| Fee: | |

## Client Information      ☐ Bill To      ☐ Send To

| | |
|---|---|
| Client: | |
| Branch: | |
| Address: | |
| City: | State: | Zip: |
| Phone: | Fax: |
| Contact: | |
| Misc: | |

| | | |
|---|---|---|
| Tax: | | |
| Total Amount: | | |
| Payment 1: | | |
| Check #: | | Date: |
| Payment 2: | | |
| Check #: | | Date: |
| Due: | | |

## Appraiser/Broker Information

| | | | | | |
|---|---|---|---|---|---|
| Name: | Sandy Bass | | Supervisor: | | |
| Cert #: | AL029698 | State: | Cert #: | | State: |
| License #: | AL029698 | State: CA | License #: | | State: |
| Exp. Date: | | | Exp. Date: | | |

## Primary Contact Information

| | | |
|---|---|---|
| Primary Contact: | | Home Phone: |
| Best time to call: | | Work Phone: |

## Secondary Contact Information

| | | |
|---|---|---|
| Secondary Contact: | | Home Phone: |
| Best time to call: | | Work Phone: |

## Special Instructions

## Comments

AA ACTION APPRAISAL 1-888-588-5788
## LandSafe Additional Field Report

Appr. File No: 5815139

Loan No:

Countrywide Tracking Number: 0885D74EC

Countrywide Branch Number: 0006094000

LandSafe Order Number: 5815139

Acknowledgement Number:

For Internal Use Only:

Dampness: None noted          Rate Y or N: N          FEMA Map Date: 03/02/2006

Settlement: None noted          Rate Y or N: N

Infestation: None noted          Rate Y or N: N

Year Built: 1961          (must be in CCYY:four digits)          Age / Year Built (from Form): 1961 ±

'As of Date' from Appraisal: 08/17/2006

'As of Date' Required by Countrywide: 20060817          (YYYYMMDD Format)

Appraiser's Name: Sandy Bass          Date Signed: 08/18/2006

First Name: Sandy          Middle Initial:          Last Name: Bass

Certification #: AL029698

Supervisory Appraiser's Name:          Date Signed:

First Name:          Middle Initial:          Last Name:

Certification #:

## CONDO ONLY!

| Comparable #1 | Comparable #2 | Comparable #3 |
|---|---|---|
| | | |
| | | |
| Same Project as Subject?   Y or N: | Same Project as Subject?   Y or N: | Same Project as Subject?   Y or N: |

| Comparable #4 | Comparable #5 | Comparable #6 |
|---|---|---|
| | | |
| | | |
| Same Project as Subject?   Y or N: | Same Project as Subject?   Y or N: | Same Project as Subject?   Y or N: |

Converted?     Y or N:

Year Converted:

Thumbnails



Subject Front View

Title



Subject Rear View



Subject Street Scene



Extra Photo 1



Extra Photo 2



Extra Photo 3



Sales Comp. 1



Sales Comp. 2



Sales Comp. 3




Sales Comp. 4

Sales Comp. 5

Sales Comp. 6



Plat Map



Location Map

**ADDENDUM**

| Borrower: | Sharon Brothers | | | Order #: | 5848559 |
|---|---|---|---|---|---|
| Property Address: | 31 LINCOLN ST | | | | |
| City: | Watsonville | State: | CA | Zip: | 95076 |
| Lender: | COUNTRYWIDE - FSLD | | | | |

**Reviewer's Comments**

Refinance of a 1961, det. sfr in avg condition.. Sales in the original report are across major boundaries and dissimilar in age. The prior VO references 2 sales from the immediate area submitted for the VO which were not considered comparable. One was significantly larger in gla to the subject and the other was considered to be a high sale for the area.

In the Reconsideration process, the second sale, with close gla, was researched and found in the Reviewer's database to be similar in appeal and condition to the subject. It is noted to be located one block southwest. The original appraiser was contacted to further research this sale to determine if it was an anomaly for the area or sold under unusual circumstances which would indicate 'high for the area'. The appraiser responded it did not appear during the original data research of the subject since its close date was right at the six month close time. An amended report has been submitted with an amended value including the two sales referenced in the VO. The appraiser stated 'had this sale (#1 with close gla) been found during the initial research' it would have been included in the report'.

Conclusion: The subject's prior value of $672,000 may be a closer indicator of the current market, however, this value is within tolerance of the amended value of $700,000 and the reconsideration concurs.

**Definition of Market Value:** *Market value*, as ...enced herein, means the most probable price which a property ...id bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: 1.) buyer and seller are typically motivated; 2.) both parties are well informed or well advised and acting in what they consider their own best interests; 3.) a reasonable time is allowed for exposure in the open market; 4.) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and, 5.) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.  (Source of Market Value Definition: *Uniform Standards of Professional Appraisal Practice and Advisory Opinions 2005 Edition*, Appraisal Standards Board, The Appraisal Foundation, effective January 1, 2005, page 210; with this primary source additionally citing various other sources "from regulations published by federal regulatory agencies pursuant to Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act [FIRREA] of 1989 between July 5, 1990 ... by ... OCC.")

**Scope of the Value Opinion Review:**
The LandSafe Appraisal Value Opinion Scope of Work is limited to a "desktop" analysis of :
• Information presented in the Original Appraisal Report (OAR) being reviewed;
• Additional appraisal reports or appraisal field review reports, as identified and included in the assignment;
• Supplemental data submitted for review;
• Supplemental market data described below, all of which have been analyzed to <u>determine the appropriate and reasonable nature of the data, analysis and conclusions contained</u> <u>the report(s) under review and to reconcile a conclusion of the subject's most probable value within the scope of the assignment.</u> Note: Reasons for any value disagreement must b. developed and summarized, as required by USPAP.  If additional local market resources beyond those described were researched, those resources must be identified in the reviewer's comments.

**Reviewer must, at a minimum:**
• Complete a review of the appraisal and / or appraisal field review reports included in the assignment for completeness, appropriate comparable selection, methodology, analysis and conclusions that support the value conclusion(s) derived.
• Search and consider secondary sales data from <u>SiteXData</u>, <u>RealQuest</u>, <u>Realtor.com</u> and <u>ValueFinder</u>
• Determine if the market value presented in the report(s) is adequately supported and reasonable (within lender's tolerances)
    o   If supported
        • Summarize facts contained in the report(s) under review
        • Summarize secondary market data relevant to a valuation analysis of the subject property
        • Reconcile the report(s) data and secondary data into a conclusion of the subject's most probable value
        • If reviewing more than one report, determine and report the most credible value supported by the reports and secondary data

    o   If not supported:
        • Develop reasons for any value disagreement
        • Summarize reasons as required by USPAP
        • Report the alternate value on the Value Opinion Form
        • If the data contained in the reports and supplemental data is insufficient to derive an alternative value estimate, a New Appraisal or Field Review should be recommended  OR
        • Reviewer is to contact the appraiser / field reviewer (if a LandSafe product) for corrections / revisions as required.

**Reviewer is NOT required to:**
• Make physical inspections of the subject, sales or listings referenced in the reports under review, or any other data found in supplemental data bases
• Reconfirm the factual data in the reports under review

The review appraiser must address credibility of the report(s) under review, consider secondary market data, develop and report an opinion of value.  Typically, the Value Opinion Reviewer's conclusions are based primarily on the Sales Comparison Approach, with secondary consideration given to the Cost and Income approaches (<u>unless the Cost and/or Income Approach are documented and reconciled in the report(s) under review as being more relevant to the Subject's market value)</u>. The research, analysis, and conclusions derived by the reviewer are completed from a desk prospective without a field inspection.

*An Extraordinary Assumption is made that the report(s) under review include credible factual information for the Subject, market data and related market area. It is not within the scope of the assignment to reconfirm the factual data.*

**Contingent and Limiting Conditions:** The subsequent reviewer's certification is subject to the following conditions and such other specific and limiting conditions as are set forth by the Reviewer herein: 1) The Reviewer assumes no responsibility for matters of a legal nature affecting the property which is the subject of this review or the title thereto, nor does the Reviewer render any opinion as to the title, which is assumed to be good and marketable; 2) The Reviewer is not required to give testimony or appear in court because of having made the review, unless such arrangements have been previously made; 3) The Reviewer assumes that there are no hidden or unapparent conditions of the property, subsoil, or structures, which would render it more or less valuable.  The Reviewer assumes no responsibility for such conditions, or for engineering which might be required to discover such factors; 4) Information, estimates, and opinions furnished to the Reviewer, and contained in this review report, were obtained from sources considered reliable and believed to be true and correct.  However, no responsibility for accuracy of such items furnished to the Reviewer can be assumed by the Reviewer; 5) Disclosure of the contents of this report is governed by the *Uniform Standards of Professional Appraisal Practice*, as well as the *Code of Professional Ethics and Standards of Professional Appraisal Practice* of the Appraisal Institute (latter applies only if signing appraiser is an associate or designated member of the Appraisal Institute); 6) Neither all, nor any part of the content of this review report, or a copy thereof (including the conclusions of the review, the identity of the Reviewer, professional designations, reference to any professional appraisal organizations, or the company with which the Reviewer is connected), shall be used for any purposes by anyone but the client specified in this review report, its successors and assigns, professional appraisal organizations, any state or federally approved financial institution, any department, agency, or instrumentality of the United States or any state or the District of Columbia, without the previous written consent and approval of the Reviewer; 7) No change of any item in this review report shall be made by anyone other than the Reviewer and the Reviewer shall have no responsibility for any such unauthorized change; 8) This review was performed for internal purposes of LandSafe Appraisal Services, Inc.; and, 9) The Reviewer makes the extraordinary assumption that the factual information contained in the report(s) under review is true and correct.

**Reviewer's Certification** (per USPAP Standards Rule 3-3): I certify that, to the best of my knowledge and belief:  1) The facts and data reported by the Reviewer and used in the review process are true and correct; 2) The analyses, opinions, and conclusions in this review report are limited only by the assumptions and limiting conditions stated in this review report and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions; 3) I have no present or prospective interest in the property that is the subject of the work under review and no personal interest with respect to the parties involved; 4) I have no bias with respect to the property that is the subject of the work under review or to the parties involved with this assignment; 5) My engagement in this assignment was not contingent upon developing or reporting predetermined results; 6) My compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in this review or from its use; 7) My analyses, opinions, and conclusions were developed and this review report was prepared in conformity with the *Uniform Standards of Professional Appraisal Practice*; 8) I have <u>not</u> made a personal inspection of the Subject Property of the work under review; 9) No one provided significant professional appraisal, appraisal review, or appraisal consulting assistance to the person signing this certification; (NOTE: Subsequent Certification Items #10 and #11 apply only if signing appraiser is an associate or designated member of the Appraisal Institute); 10) The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the *Code of Professional Ethics & Standards of Professional Practice* of the Appraisal Institute, which include the *Uniform Standards of Professional Appraisal Practice*; 11) The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives; and, 12) As of the date of this report, I have completed the continuing education program of the Appraisal Institute.

**Reviewer Signature:**

*[signature]*

| | |
|---|---|
| Reviewer Name: | Jane Price |
| State Certification #: | TX-1324380-R |
| Or State License #: | |
| State: | TX |
| Expiration Date of Certification or License: | 31-Dec-2006 |

# EXHIBIT G

OMB Approval No. 2502-0265

| A. Settlement Statement | | | | B. Type of Loan | |
|---|---|---|---|---|---|

**First American Title Company**
**Final Statement**   8-31-06

| B. Type of Loan | |
|---|---|
| 1-5.  Loan Type  Conv. Unins. | |
| 6.    File Number  2701-2482813 | |
| 7.    Loan Number  142989134 | |
| 8.    Mortgage Insurance Case Number | |

C.  Note:   This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(POC)" were paid outside this closing; they are shown here for informational purposes and are not included in the totals.

D.    Name of Borrower: Sharon Brothers
        31 Lincoln Street, Watsonville, CA 95076

E.    Name of Seller:

*CERTIFIED TO BE A TRUE AND ... COPY. FIRST AMERICAN TITLE COMPAN ... Monterey County, CA   By*

F.    Name of Lender: Countrywide Home Loans
        2380 Performance Drive RGV-C81
        Richardson, TX 75082-4333

G.    Property Location: 31 Lincoln Street, Watsonville, CA 95076

H.    Settlement Agent: First American Title Company
        Address: 60 West Market, Suite 140, P.O. Box 970, Salinas, CA 93901

Place of Settlement Address: 60 West Market, Suite 140, P.O. Box 970, Salinas, CA 93901

| I. |
|---|
| Settlement Date: 08/31/2006 |
| Print Date: 08/30/2006, 6:47 PM |
| Disbursement Date: 08/31/2006 |

| J.  Summary of Borrower's Transaction | | K.  Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due From Borrower** | | **400. Gross Amount Due To Seller** | |
| 101.  Contract Sales Price | | 401.  Contract Sales Price | |
| 102.  Personal Property | | 402.  Personal Property | |
| 103.  Settlement charges to borrower (line 1400) | 28,566.81 | 403.  Total Deposits | |
| 104.  Supplemental Summary | 562,903.39 | 404. | |
| 105.  Flood Check Fee (2nd) - Landsafe Flood Determination | 26.00 | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106.  City/town taxes | | 406.  City/town taxes | |
| 107.  County taxes | | 407.  County taxes | |
| 108.  Assessments | | 408.  Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| **120. Gross Amount Due From Borrower** | **591,496.20** | **420. Gross Amount Due To Seller** | |
| **200. Amounts Paid By Or In Behalf of Borrower** | | **500. Reductions In Amount Due to Seller** | |
| 201.  Deposit or earnest money | | 501.  Excess deposit (see instructions) | |
| 202.  Principal amount of new loan(s) | 560,000.00 | 502.  Settlement charges (line 1400) | |
| 203.  Existing loan(s) taken subject | | 503.  Existing loan(s) taken subject | |
| 204.  New Loan to File from Countrywide Home Loans | 31,500.00 | 504.  Payoff of first mortgage loan | |
| 205. | | 505.  Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210.  City/town taxes | | 510.  City/town taxes | |
| 211.  County taxes | | 511.  County taxes | |
| 212.  Assessments | | 512.  Assessments | |
| 213. | | 513 | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/For Borrower** | **591,500.00** | **520. Total Reduction Amount Due Seller** | |
| **300. Cash At Settlement From/To Borrower** | | **600. Cash At Settlement To/From Seller** | |
| 301.  Gross amount due from Borrower (line 120) | 591,496.20 | 601.  Gross amount due to Seller (line 420) | |
| 302.  Less amounts paid by/for Borrower (line 220) | 591,500.00 | 602.  Less reductions in amounts due to Seller (line 520) | |
| 303.  Cash ( From) (X To) Borrower | 3.80 | 603. | |

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.
Settlement Agent:                                                                                     Date: 8-31-06

**L. Settlement Charges**

| | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|
| **700. Total Sales/Broker's Commission based on price** | | |
| Division of Commission (line 700) as follows | | |
| 701. | | |
| 702. | | |
| 703. Commission paid at Settlement | | |
| 704. | | |
| **800. Items Payable in Connection with Loan** | | |
| 801. Loan Origination Fee | | |
| 802. Loan Discount 4.3750% - Countrywide Home Loans | 24,500.00 | |
| 803. Appraisal Fee - Landsafe Appraisal Services Inc          POC-B $300.00 | | |
| 804. Credit Report - Landsafe Credit | 35.00 | |
| 805. Lender's Inspection Fee | | |
| 806. Mortgage Insurance Application Premium | | |
| 807. Assumption Fee | | |
| 808. Document Preparation Fee (1st) - Countrywide Home Loans | 125.00 | |
| 809. Tax Service Fee (1st) - Countrywide Tax Service Corp | 60.00 | |
| 810. Flood Check Fee (1st) - Landsafe Flood Determination | 26.00 | |
| 811. Processing Fee (1st) - Countrywide Home Loans | 675.00 | |
| 812. Appraisal Fee (1st) - Landsafe Appraisal Services Inc | 175.00 | |
| 813. | | |
| 814. | | |
| Supplemental Summary | | |
| **900. Items Required by Lender to be Paid in Advance** | | |
| 901. Interest 08/31/06 to 09/01/06 @$97.810000/day - Countrywide Home Loans | 97.81 | |
| 902. | | |
| 903. Hazard Insurance Premium for | | |
| 904. | | |
| 905. | | |
| Supplemental Summary | | |
| **1000. Reserves Deposited with Lender** | | |
| 1001. Hazard Insurance | | |
| 1002. Mortgage Insurance | | |
| 1003. City Property Taxes | | |
| 1004. County Property Taxes | | |
| 1005. Annual assessments | | |
| 1006. | | |
| 1007. | | |
| 1008. Aggregate Accounting Adjustment | | |
| **1100. Title Charges** | | |
| 1101. Settlement or closing fee - First American Title Company | 200.00 | |
| 1102. Abstract or title search | | |
| 1103. Title examination | | |
| 1104. Title Insurance Binder | | |
| 1105. Document Fee | | |
| 1106. Notary Fee | | |
| 1107. Attorney Fee | | |
| (includes above item numbers: ) | | |
| 1108. Title Insurance – See supplemental page for breakdown of individual fees and payees | 1,200.00 | |
| (includes above item numbers: ) | | |
| 1109. *Lender's coverage $560,000.00 Premium: $1,200.00 | | |
| 1110. Owner's coverage $0.00 | | |
| 1111. | | |
| 1112. | | |
| 1113. | | |
| 1114. | | |
| 1115. | | |
| 1116. | | |
| 1117. | | |
| **1200. Government Recording and Transfer Charges** | | |
| 1201. *Recording fees: Deed $0.00 Mortgage $210.00 Release $0.00 | 210.00 | |
| 1202. City/county tax/stamps: | | |
| 1203. State tax/stamps: | | |
| 1204. | | |
| 1205. | | |
| 1206. | | |
| **1300. Additional Settlement Charges** | | |
| 1301. Survey to | | |
| 1302. Pest Inspection to | | |
| 1303. Document Signing Fee to CMD Mobile Notary, Inc. | 250.00 | |
| 1304. Payment on Account to PAC Cdt Svc c/o Sharon Brothers | 1,013.00 | |
| 1305. | | |
| 1306. | | |
| 1307. | | |
| 1308. | | |
| 1309. | | |
| 1310. | | |
| 1311. | | |
| 1312. | | |
| 1313. | | |
| 1314. | | |
| Supplemental Summary | | |
| **1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K)** | 28,566.81 | |

| Supplemental Page<br>HUD-1 Settlement Statement | File No.<br>2701-2482813 |
|---|---|

| **First American Title Company**<br>**Final Statement** | Loan No.<br>142989134 |
|---|---|
| | Settlement Date:<br>08/31/2006 |

Borrower Name & Address:  Sharon Brothers
31 Lincoln Street, Watsonville, CA 95076

Seller Name & Address:

| Section L. Settlement Charges continued | | Paid From<br>Borrower's<br>Funds at<br>Settlement | Paid From<br>Seller's<br>Funds at<br>Settlement |
|---|---|---|---|
| 1108.    Supplemental Summary | 1,200.00 | | |
| a) ALTA Extended Loan Policy 1992 - 1 - First American Title Company | | 1,100.00 | |
| b) ALTA Extended Loan Policy 1992 - 2 - First American Title Company | | 100.00 | |
| 1201.    Supplemental Summary | 210.00 | | |
| a) Record Trust Deed - 1 - First American Title Company | | 114.00 | |
| b) Record Trust Deed - 2 - First American Title Company | | 96.00 | |

| Section J.  Summary of Borrower's Transaction continue | | | |
|---|---|---|---|
| 100.  Gross Amount Due From Borrower | | Borrower Charges | Borrower Credits |
| 104.    Supplemental Summary | 562,903.39 | | |
| a) Principal Balance    - Countrywide | | 540,000.00 | |
| Interest on Payoff Loan 07/01/06 to 09/02/06 @$107.112300/day | | 6,855.19 | |
| Late Charge | | 325.80 | |
| Prepayment Penalty | | 15,638.40 | |
| Recording Fee | | 9.00 | |
| Reconveyance Fee | | 45.00 | |
| Statement/Forwarding Fee | | 30.00 | |
| 200.  Amounts Paid By Or In Behalf of Borrower | | | |

| The following Section is restated from the Settlement Statement Page 1 | | | |
|---|---|---|---|
| 300. Cash At Settlement From/To Borrower | | 600.  Cash At Settlement To/From Seller | |
| 301.  Gross amount due from Borrower (line 120) | 591,496.20 | 601.  Gross Amount due to Seller (line 420) | |
| 302.  Less amounts paid by/for Borrower (line 220) | 591,500.00 | 601.  Less reductions in amounts due to Seller (line 520) | |
| 303.  Cash ( From) (X To) Borrower | 3.80 | 603. | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and distributions made on my account or by me in this transaction.  I further certify that I have received a copy of the HUD-1 Settlement Statement.



### First American Title Company

60 West Market, Suite 140, P.O. Box 970 • Salinas, CA 93901



## Borrower's Final Settlement Statement

**Property:**   31 Lincoln Street, Watsonville, CA 95076

**File No:**   2701-2482813
**Officer:**   Natalie Lynn/SL
**New Loan No:**   142989134
**Settlement Date:**   08/31/2006
**Disbursement Date:**   08/31/2006
**Print Date:**   8/30/2006, 6:47 PM

**Buyer:**   Sharon Brothers
**Address:**   31 Lincoln Street, Watsonville, CA 95076
**Seller:**
**Address:**

| Charge Description | Borrower Charge | Borrower Credit |
|---|---|---|
| **New Loan(s):** | | |
| Lender: Countrywide Home Loans | | |
| New Loan to File  - Countrywide Home Loans | | 560,000.00 |
| Interest on New Loan (1st) 08/31/06 to 09/01/06 @$97.810000/day - Countrywide Home Loans | 97.81 | |
| Loan Discount Points (1st) 4.3750% - Countrywide Home Loans | 24,500.00 | |
| Appraisal Fee (1st)  - Landsafe Appraisal Services Inc          POC-B $300.00 | | |
| Credit Report (1st)  - Landsafe Credit | 35.00 | |
| Document Preparation Fee (1st)  - Countrywide Home Loans | 125.00 | |
| Tax Service Fee (1st)  - Countrywide Tax Service Corp | 60.00 | |
| Flood Check Fee (1st)  - Landsafe Flood Determination | 26.00 | |
| Processing Fee (1st)  - Countrywide Home Loans | 675.00 | |
| Appraisal Fee (1st)  - Landsafe Appraisal Services Inc | 175.00 | |
| Lender: Countrywide Home Loans | | |
| New Loan to File  - Countrywide Home Loans | | 31,500.00 |
| Flood Check Fee (2nd)  - Landsafe Flood Determination | 26.00 | |
| | | |
| **Payoff Loan(s):** | | |
| Lender: Countrywide | | |
| Principal Balance  - Countrywide | 540,000.00 | |
| Interest on Payoff Loan 07/01/06 to 09/02/06 @$107.112300/day - Countrywide | 6,855.19 | |
| Late Charge  - Countrywide | 325.80 | |
| Prepayment Penalty  - Countrywide | 15,638.40 | |
| Recording Fee  - Countrywide | 9.00 | |
| Reconveyance Fee  - Countrywide | 45.00 | |
| Statement/Forwarding Fee  - Countrywide | 30.00 | |
| | | |
| **Title/Escrow Charges to:** | | |
| Escrow Fee - First American Title Company | 200.00 | |
| ALTA Extended Loan Policy 1992 - 1 - First American Title Company | 1,100.00 | |
| ALTA Extended Loan Policy 1992 - 2 - First American Title Company | 100.00 | |
| Record Trust Deed - 1 - First American Title Company | 114.00 | |
| Record Trust Deed - 2 - First American Title Company | 96.00 | |
| | | |
| **Disbursements Paid:** | | |
| Document Signing Fee to CMD Mobile Notary, Inc. | 250.00 | |
| Payment on Account to PAC Cdt Svc c/o Sharon Brothers | 1,013.00 | |
| | | |
| **Cash ( From) (X To) Borrower** | 3.80 | |
| | | |
| **Totals** | 591,500.00 | 591,500.00 |

Prepared by: ASHLEY WHITESIDE

# DEDUCTIONS FROM FUNDING CHECK

| | | | |
|---|---|---|---|
| DATE: | 09/01/2006 | BRANCH #: | 0000844 |
| NAME: | SHARON BROTHERS (ET AL) | FINANCE TYPE: | REFI (NO CASH) |
| LOAN #: | 142989134 | ESCROW #: | 2482813 |
| LOAN TYPE: | CONV UNINSURED | COMMITMENT #: | 5219 |
| LOAN AMOUNT: $560,000.00 | | LTV: | 80.00 % |
| FHA MIP/VA FUNDING FEE: $ | | INTEREST RATE: | 6.375 % |

| | | | |
|---|---|---|---|
| LOAN AMOUNT WITH MIP/FUNDING FEE INCLUDED: $ | | | 560,000.00 |
| New York Tax | | | 0.00 |
| Deductions From Check | | | 25,993.81 |
| | Origination Income | 0.000 % | 0.00 |
| 801. | Origination Fee | | 0.00 |
| 802. | Discount | 4.375 % | 24,500.00 |
| 803. | Appraisal (Invoice) 0.00 | (Pend. Inv) 475.00 | 475.00 |
| 804. | Credit Report (Invoice) 0.00 | (Pend. Inv) 35.00 | 35.00 |
| 805. | Inspection Fee | | 0.00 |
| 808. | Warehouse Fee | | 0.00 |
| | Processing Fee + Points in lieu | | 675.00 |
| 810. | Tax Service Fee | | 60.00 |
| 811. | Flood Check Fee | | 26.00 |
| 812. | VA Funding Fee/FHA One Time Mip | | 0.00 |
| 813. | Wire Transfer Fee | | 0.00 |
| 814. | Buydown Expense | | 0.00 |
| 901. | Interest: 1 Days @ $ 97.81 /Day | | 97.81 |
| 902. | Primary PMI Premium First Year | | 0.00 |
| | Hazard Insurance Premium (1st Yr) if CIS | | 0.00 |
| | Flood Insurance Premium (1st Yr) if CIS | | 0.00 |
| | CHL Payoff 114903661 | | 0.00 |
| | Document Preparation-Lender | | 125.00 |

D
R
A
F
T

| | | |
|---|---|---|
| Impounds | | 0.00 |
| Credits | | -300.00 |
| AR | | 0.00 |
| Total Deductions | 25,693.81 | 25,693.81 |

NET AMOUNT OF FUNDING CHECK      (Check #:                    )  534,306.19

Check Payable to:      FIRST AMERICAN TITLE

FHA/VA/CONV
● Deductions From Funding Check
2C102-US (04/05)(d)                                          PAGE 1





Prepared by: ASHLEY WHITESIDE
DATE:              09/01/2006
BORROWER:     SHARON BROTHERS (ET AL)
CO-BORROWER:
LOAN #:             142989134
PROPERTY ADDRESS: 31 Lincoln St
                            Watsonville, CA 95076-5028

### FOR AUDIT PURPOSES ONLY:

| DISCOUNT | | BRANCH INFORMATION | |
|----------|------|--------------------|--------|
| ORIGINATION FEE | 0.000 | COMMIT/PROCESSING | 675.00 |
| POINTS IN LIEU OF FEES | 0.000 | WAREHOUSE (MISC.) | 125.00 |
| BASE POINTS | 3.250 | ORIGINATION | 0.00 |
| Escrows Waived | 0.125 | POINTS IN LIEU | 0.00 |
| NonConf LoanAmt > 500001-600k | -0.375 | APPRAISAL REMAINDER | 475.00 |
| NC Fixed EC 40 | 0.500 | CREDIT RPT REMAINDER | 35.00 |
| NC Exp Reduced LTV 75.01-80 FICO 660- | 0.625 | | |
| NC Exp 80/10/10 | 0.250 | | |
| **TOTAL** | **4.375** | | **1,310.00** |

## DEDUCTIONS FROM FUNDING CHECK CONTINUED

Taxes:      Not Impounded

| Name | Impound months | $Per Month | ParcelID | Payee Name | Impound Amount |
|------|----------------|------------|----------|------------|----------------|
| | | | | | 0.00 |
| Hazard Ins. | 0 | 52.76 | | | 0.00 |
| Flood Ins. | 0 | 85.42 | | | 0.00 |
| Aggregate Analysis Adjustment | | | | | |
| | | | | TOTAL IMPOUNDS/ESCROWS | 0.00 |

Prepared by: ASHLEY WHITESIDE
DATE:              09/01/2006
BORROWER:          SHARON BROTHERS (ET AL)
CO-BORROWER:
LOAN #:            142989134
PROPERTY ADDRESS: 31 Lincoln St
                   Watsonville, CA 95076-5028

### DEDUCTIONS FROM FUNDING CHECK CONTINUED

| | | |
|---|---:|---:|
| Credits | | -300.00 |
| Appraisal (Paid in advance) | 300.00 | |
| Credit Report (Paid in advance) | 0.00 | |
| Buydown Credit | 0.00 | |
| Coupon Credit | 0.00 | |
| MIP Credit (FHA Refi)/LPMI Credit | 0.00 | |
| Closing Costs to Title Company | 0.00 | |
| Interest Short Payment Credit | 0.00 | |
| | | |
| AR | | 0.00 |
| () | | |

Prepared by: ASHLEY WHITESIDE

PRINT DATE/TIME: 08/26/2006    4:12:59 PM
BORROWER:    SHARON BROTHERS
CO-BORROWER:
CASE #:
LOAN #:    142989134
PROPERTY ADDRESS: 31 Lincoln St
                 Watsonville, CA 95076-5028

## ADDENDUM TO DEDUCTIONS FROM CHECK

```
** APPRAISER **
LANDSAFE
CA
============================================================================================================
```

FHA/VA/CONV
Supporting Schedule                        Page 4
2C130-US (09/02)(d)



